# Exhibit 1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

JEFFREY H. WHITE, individually, and as Administrator of
THE ESTATE OF ELEANOR WHITE, and
WHITE OAKS REHABILITATION AND NURSING CENTER,

**Summons**
**Index No.** _602409/2025_
Filed 1/31/2025

Plaintiff(s),

-against-

IRONSHORE SPECIALITY INSURANCE COMPANY,

Defendant

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and
to serve a copy of your Answer, or if the Complaint is not served with this Summons to
serve a Notice of Appearance, on the Plaintiff's attorney within twenty (20) days after the
service of this Summons, exclusive of the day of service, or within thirty (30) days after
the service is complete, if this Summons is not personally delivered to you within the
State of New York, and in case of your failure to appear or answer, Judgment will be
taken against you by default for the relief demanded in the Complaint.

Dated: Garden City, New York

January 31, 2025

McDONNELL ADELS & KLESTZICK, PLLC

By: _____

Evan Klestzick
*Attorneys for Plaintiff*
401 Franklin Avenue
Garden City, New York 11530
(516) 328-3500
File No.: MAG 406(a)

TO:    IRONSHORE SPECIALITY INSURANCE COMPANY

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/31/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

JEFFREY H. WHITE, individually, and as Administrator of
THE ESTATE OF ELEANOR WHITE, and
WHITE OAKS REHABILITATION AND NURSING CENTER,

                            Plaintiff(s),

-against-

IRONSHORE SPECIALITY INSURANCE COMPANY,

                            Defendant(s).

---

**VERIFIED COMPLAINT**
Index No. 602409/2025
Filed: 1/31/2025

Plaintiffs, JEFFREY H. WHITE, individually and as Administrator of THE ESTATE OF ELEANOR WHITE, and WHITE OAKS REHABILITATION AND NURSING CENTER (hereinafter "WHITE OAKS" and/or "the Plaintiffs"), by their counsel, McDONNELL ADELS & KLESTZICK, PLLC, as and for their verified complaint to obtain a judgment declaring the rights and legal relations of the parties to this action, states as follows:

## INTRODUCTION

1.      This is an action for a declaratory judgment pursuant to CPLR §§ 3001 and 3017(b) defining and declaring the rights, duties, obligations and legal relationships by and between the Plaintiffs and Defendant IRONSHORE SPECIALITY INSURANCE COMPANY (hereinafter "IRONSHORE" or "Defendant").

2.      This action seeks a declaration that Defendant IRONSHORE has the duty to defend and indemnify WHITE OAKS REHABILITATION AND NURSING CENTER ("WHITE OAKS") in the lawsuit commenced against WHITE OAKS by AMELIA McDONNELL as PROPOSED ADMINISTRATIRIX OF THE ESTATE OF WILLIAM McDONNELL, DECEASED (hereinafter "McDONNELL") in the Supreme Court of the State of New York, County of Nassau, under Index

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/31/2025

Number 500016/23 (the "McDonnell Action"), pursuant to the terms of the policy of insurance Plaintiffs had in place with IRONSHORE under policy number HC7PACIKF1002.

3.    This action also seeks a declaration that Defendant IRONSHORE shall reimburse Plaintiffs for all costs and fees incurred by them in obtaining IRONSHORE's defense of their interests in the lawsuit commenced against WHITE OAKS in the McDonnell Action; and, alternatively, all damages, costs, fees, and awards obtained against Plaintiffs as a result of IRONSHORE's failure to defend Plaintiffs' interests in the McDonnell Action.

4.    An actual justiciable controversy exists among the Plaintiffs and Defendant IRONSHORE with respect to the scope and nature of the coverage obligations owed by IRONSHORE to the Plaintiffs in connection with the McDonnell Action.

## THE PARTIES

5.    At all times mentioned herein, Plaintiff JEFFREY H. WHITE was and still is an owner of WHITE OAKS.

6.    At all times mentioned herein, Plaintiff JEFFREY H. WHITE was and is the Administrator of THE ESTATE OF ELEANOR WHITE.

7.    At all times mentioned herein, THE ESTATE OF ELEANOR WHITE was and still is an owner of WHITE OAKS.

8.    At all times mentioned herein, WHITE OAKS was and still is duly authorized to operate as a rehabilitation and skilled nursing facility in the County of Nassau, State of New York.

9.    Upon information and belief, at all times pertinent herein, Defendant IRONSHORE was and still is a foreign corporation duly authorized to transact business in the State of New York.

10.    Upon information and belief, Defendant IRONSHORE is affiliated with Liberty Mutual Insurance Company.

**Page 2 of 15**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

## JURISDICTION AND VENUE

11.     This declaratory judgment action is brought pursuant to CPLR §§ 3001 and 3017(b)

12.     This Court has jurisdiction of this action pursuant to CPLR § 302, as Defendant IRONSHORE is authorized to conduct business and/or is transacting business within the State of New York.

13.     Venue is proper pursuant to CPLR § 503, insofar as WHITE OAKS operates within the County of Nassau, State of New York.

## FACTS

14.     On or about April 22, 2023, for good and valuable consideration, Defendant IRONSHORE issued to Plaintiffs a long term care organizations professional liability, general liability, employee benefits liability and regulatory proceeding defense coverage policy of insurance covering the Plaintiffs' facility, located at 8565 Jericho Turnpike, Woodbury, New York 11797. A copy of the IRONSHORE policy of insurance is annexed hereto as **Exhibit "A".**

15.     The IRONSHORE policy of insurance was issued to Plaintiffs under policy number HC7PACIKF1002. See **Exhibit "A".**

16.     The IRONSHORE policy of insurance provided coverage to Plaintiffs from April 22, 2023 to April 24, 2024, with a retroactive date of April 22, 2007, insuring Plaintiffs for claims of, inter alia, general liability. See id.

17.     Endorsement # 3 of the IRONSHORE policy of insurance specifically listed WHITE OAKS, located at 8565 Jericho Turnpike, Woodbury, New York 11797, as the scheduled location, with an applicable retroactive coverage date of April 22, 2007 with regard to "occurrences". See id.

18.     The IRONSHORE policy of insurance defined "occurrence" as including "any accident, including continuous or repeated exposure to the same harmful conditions, which results in

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

injury or damage neither expected nor intended by the Insured." See id.

19.    The subject policy of insurance lists JEFFREY WHITE and THE ESTATE OF ELEANOR WHITE as the named insureds.

20.    Endorsement # 11 of the IRONSHORE policy of insurance provided that "The Insurer will pay on behalf of the Insured any Loss that the Insured is Legally obligated to pay as a result of any covered Claim alleging Bodily Injury, Property Damages, Advertising Injury or Personal Injury that is caused by an Occurrence that takes place on or after the Retroactive Date, but before the expiration of the Policy Period, provided that the Claim is first made against the Insured during the Policy Period or applicable Extended Reporting Period, and subject to the applicable Limit of Liability." See id.

21.    The IRONSHORE policy of insurance specified that IRONSHORE "has the right and duty to defend any Claim covered by [the insuring agreements], even if any of the allegations of such Claim are groundless, false or fraudulent". See id.

22.    On or about September 27, 2023, the McDonnell Action was commenced against WHITE OAKS in the Supreme Court of the State of New York, County of Nassau, under Index Number 500016/23. A copy of the summons and verified complaint in the McDonnell Action is annexed hereto as **Exhibit "B"**.

23.    The verified complaint in the McDONNELL Action alleged injuries as a result of decedent WILLIAM McDONNELL's admission at WHITE OAKS from on or about September 22, 2020 through on or about December 12, 2020, which allegedly resulted in his death. See **Exhibit "B"**.

24.    The verified complaint in the McDonnell Action included causes of action against WHITE OAKS alleging violations of Public Health Law Sections 2801(d), and 2803(c), general negligence and wrongful death. See id.

**Page 4 of 15**

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

25.     On or about October 11, 2023, the McDONNELL summons and verified complaint was served upon an employee of WHITE OAKS.

26.     On or about October 19, 2023, Defendant IRONSHORE was notified of the McDONNELL Action against WHITE OAKS.

27.     On or about October 19, 2023, Defendant IRONSHORE was provided with a copy of the McDonnell Action commenced against WHITE OAKS. Id.

28.     The allegations in the McDONNELL verified complaint gave rise to a claim covered under the IRONSHORE policy of insurance issued to Plaintiffs under policy number HC7PACIKF1002, on its face, specifically with regard to the third and fourth causes of actions.

29.     Defendant IRONSHORE refused to interpose an answer on WHITE OAKS' behalf in the McDonnell Action.

30.     On or about January 16, 2024, counsel for McDONNELL in the McDonnell Action filed a motion for judgment on default as against WHITE OAKS, and requesting that the matter be set down for an inquest at the time of trial on the issue of damages.  This motion was made returnable in Supreme Court, Nassau County on February 2, 2024.

31.     IRONSHORE, and/or its counsel had access to NYSCEF, and all documents filed therein.

32.     IRONSHORE, and/or its counsel knew or should have known that the complaint filed against its insured WHITE OAKS was in default status.

33.     IRONSHORE, and/or its counsel knew or should have known that a motion for judgment on default was filed in the McDonnell Action against WHITE OAKS.

34.     IRONSHORE, and/or its counsel knew or should have known that Counsel for McDONNELL in the McDonnell Action obtained a judgment on default as against WHITE OAKS.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

35. IRONSHORE, and/or its counsel knew or should have known that Counsel for McDONNELL in the McDonnell Action, after securing a judgment on default as against WHITE OAKS, appeared for an inquest on damages, on October 10, 2024.

36. Notwithstanding the above, IRONSHORE, and/or its counsel have refused and continue to refuse to defend or indemnify WHITE OAKS.

37. On or about February 13, 2024, Defendant IRONSHORE issued a "declination of coverage" letter dated February 13, 2024 to Plaintiffs. A copy of the IRONSHORE "declination of coverage" letter is annexed hereto as **Exhibit "C"**.

38. The IRONSHORE "declination of coverage" letter dated February 13, 2024 acknowledged and admitted that IRONSHORE had received notice of the McDonnell Action commenced against WHITE OAKS on October 19, 2023.  See id.

39. The IRONSHORE "declination of coverage" letter dated February 13, 2024 indicated that coverage was being denied to WHITE OAKS as the McDonnell Action alleged that the decedent, WILLIAM McDONNELL had "contracted Covid-19 during his stay at [WHITE OAKS] . . . which led to his untimely death", which fell within an exclusion to coverage.  Id. at page 4.

40. IRONSHORE's so-called "declination of coverage" letter was never sent to Plaintiffs as required by Insurance Law § 3420.

41. On or about October 10, 2024, a monetary Judgment in the amount of $1,100,000 was entered as against WHITE OAKS in the McDonnell Action.

42. Defendant IRONSHORE improperly disclaimed coverage to WHITE OAKS for the McDonnell Action.

43. The IRONSHORE so-called "declination of coverage" letter dated February 13, 2024 was untimely.  Insurance Law § 3420.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

44.    The IRONSHORE so-called "declination of coverage letter" dated February 13, 2024 is fatally defective and ineffective as a matter of law.

45.    Plaintiffs have been severely prejudiced by Defendant IRONSHORE's dilatory conduct, as it enabled McDONNELL to obtain a judgment on default and monetary judgment as against WHITE OAKS.

46.    The allegations of negligence and wrongful death asserted against WHITE OAKS in the McDONNELL Action gave rise to a duty on Defendant IRONSHORE's part to defend WHITE OAKS. See, e.g., *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435 (2002); *Fitzpatrick v. American Honda Motor Co.*, 78 N.Y.2d 61 (1991).

47.    Defendant IRONSHORE failed to take proper notice of the separate causes of action for negligence and wrongful death asserted against WHITE OAKS in the McDONNELL Action before issuance of the "declination of coverage" letter dated February 13, 2024.

48.    Defendant IRONSHORE issued a late and fatally defective "disclaimer."

### AS AND FOR A FIRST CAUSE OF ACTION
### IRONSHORE'S DISCLAIMER IS IMPROPER & DEFECTIVE AS COVERAGE EXISTS
### (Declaratory Judgment)

49.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "59" as if set forth fully herein.

50.    Defendant IRONSHORE's "declination of coverage" letter dated February 13, 2024 was improper, as where any claims asserted against an insured arguably arise from covered events, the insurer is required to defend the entire action. See *Frontier Insulation Contractors v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169 (1997); *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304 (1984); *American Automobile Ins. Co. v. Security Income Planners & Co., LLC*, 847 F. Supp.2d 454 (E.D.N.Y. 2012).

**Page 7 of 15**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM          INDEX NO. 602409/2025
NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 01/31/2025

51.    Plaintiffs are insureds under the IRONSHORE policy, and are entitled to coverage under the IRONSHORE policy for McDonnell Action in general, and specifically for the third and fourth causes of action, which allege negligence and wrongful death, respectively.

52.    Defendant IRONSHORE wrongfully denied coverage to Plaintiffs under the IRONSHORE policy of insurance, and wrongfully refused to provide and assume the defense and indemnity of WHITE OAKS in the McDonnell Action.

53.    A genuine controversy and dispute exists between and among the parties as to the effect of the IRONSHORE policy, and a declaration is necessary at this time so the parties herein may ascertain their respective rights and duties under the IRONSHORE policy.

54.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A SECOND CAUSE OF ACTION
## IRONSHORE'S DISCLAIMER IS UNTIMELY AS A MATTER OF LAW
### (Declaratory Judgment)

55.    Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs numbered "1" through "51" as if set forth fully herein.

56.    Defendant IRONSHORE knew or should have known that, as a matter of law, its assertion of a declination of coverage/disclaimer pursuant to a policy exclusion depended upon such being timely noticed.

57.    Defendant IRONSHORE's "declination of coverage" letter dated February 13, 2024 was defective as it was untimely as a matter of law, having been issued more than 100 days after IRONSIDE had been placed on notice of the McDonnell Action.

58.    Defendant IRONSHORE's "declination of coverage" letter dated February 13, 2024 was defective as it was untimely as a matter of law, having never been sent to Plaintiffs directly.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

59.     It is well settled that an insurance company must provide notice of disclaimer "as soon as is reasonably possible." See e.g. Okumus v. National Specialty Ins. Co., 112 A.D.3d 797, 798 (2d Dep't 2013).

60.     The timing of disclaimer letters which invoke alleged policy exclusions, as in this case, is governed strictly by Insurance Law § 3420(d)(2) and a wide array of reported cases.

61.     Under Insurance Law § 3420, the time to deny or disclaim coverage is measured from the point in time at which the insurer first discovers the grounds for disclaimer or denial. Republic Franklin Ins. Co. v. Pistelli, 16 A.D.3d 477, 791 N.Y.S.2d 639 (2d Dep't 2005); see also Peters v. State Farm Fire and Cas. Co., 100 N.Y.2d 634, 769 N.Y.S.2d 195 (2003).

62.     In this case, the alleged grounds for Defendant's improper disclaimer were readily apparent or available to Defendant from the start; from the moment Defendant was timely sent the summons and complaint in the pending McDonnell Action on October 19, 2023. No investigation by IRONSHORE was required.

63.     However, Defendant issued an untimely and improper disclaimer, dated February 13, 2024, on the grounds that "William Campbell [sic] contracted COVID-19 during his stay at White Oaks Rehabilitation and Nursing Center (October 9, 2020-November 27, 2020) [sic] which led to his untimely death" and that the "claim is specifically excluded from" coverage under the subject Policy.

64.     Highlighting the arbitrary and capricious nature of Defendant's improper denial is the fact that Defendant listed both (i) the wrong name for the decedent William McDonnell; and (ii) the dates of Mr. McDonnell's stay at White Oaks in Defendant's so-called "coverage analysis." Defendant's so-called "coverage analysis" calls into question what exactly, if anything, Defendant reviewed; and if such improper disclaimers are issued as a matter of course by Defendant.

**Page 9 of 15**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

65.   In any event, Defendant's disclaimer is untimely as a matter of law.

66.   Defendant's obligation to provide prompt notice of disclaimer was "triggered when the insurer has a reasonable basis upon which to disclaim coverage." Republic Franklin Ins. Co. v. Pistelli, 16 A.D.3d 477, 791 N.Y.S.2d 639 (2d Dep't 2005).

67.   An insurer's explanation of such delay "is insufficient as a matter of law where the basis for denying coverage was or should have been readily apparent before the onset of the delay." Gofranullah v. 630 Realty, 16 Misc.3d 1122(A), 847 N.Y.S.2d 901. See also Schulman v. Indian Harbor Ins. Co., 40 A.D.3d 957, 836 N.Y.S.2d 682 (2d Dep't 2007).

68.   In this case, Defendant's "declination of coverage" letter dated February 13, 2024 is fatally defective and untimely as a matter of law, having been issued more than 100 days after IRONSHORE had been placed on notice of the McDonnell Action.

69.   Separately, the so-called "declination of coverage" letter was never sent to the named insureds, as required by Insurance Law § 3420.

70.   Defendant's disclaimer is fatally defective and ineffective as a matter of law.

71.   Plaintiffs are entitled to a declaration that Defendant's "declination of coverage" is null and void and that Defendant is obligated to defend and indemnify Plaintiffs in connection with the McDonnell Action.

### AS AND FOR A THIRD CAUSE OF ACTION
### DEFENDANT WAIVED DISCLAIMER
(Declaratory Judgment)

72.   In failing to timely disclaim coverage Defendant directly caused Plaintiffs to default in the McDonnell Action and incur a judgment of $1,100,000.00, exclusive of any interest.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

73.     Defendant waited more than 100 days before it disclaimed coverage.

74.     Plaintiffs therefore reasonably relied on the assumption that Defendant would honor its obligation to defend and indemnify Plaintiffs in the McDonnell Action.

75.     Defendant's conduct created Plaintiffs' reasonable reliance that Defendant would honor its obligation to defend and indemnify Plaintiffs in the McDonnell Action.

76.     Defendant's attempt to disclaim coverage is fatally defective and ineffective as a matter of law.

77.     Plaintiffs are entitled to a declaration that Plaintiff's "declination of coverage" is null and void and that Defendant is obligated to defend and indemnify Plaintiffs in connection with the McDonnell Action.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Attorney Fees)

78.     Plaintiffs repeat and reallege each and every allegation contained in all paragraphs numbered "1" through "X" as if set forth fully herein.

79.     Defendant issued a contract of insurance that required Defendant to defend and indemnify the policyholder in any lawsuit involving said contract of insurance.

80.     However, Defendant improperly disclaimed coverage for the subject claim.

81.     Due to Defendant's action, Plaintiffs have been damaged and have been compelled to retain an attorney to represent them in the instant declaratory judgment action.

82.     Plaintiffs have already incurred, and will continue to incur, attorney fees and other expenses with regard to their commencing the instant action.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

83.    As such, Plaintiffs have been and will continue to be damaged in a sum that shall be determined at the trial or on inquest of this matter.

84.    In the event that Plaintiffs prevail in the instant action, Plaintiffs demand attorney fees, along with all expenses, of any kind, against Defendant, pursuant to the insurance contract and the Court of Appeals decision in US Underwriters Ins. Co. v. City Club Hotel, LLC, 3 N.Y.3d 593 (2004).

### AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Contract)

85.    Plaintiffs repeat and reallege each and every allegation contained in all paragraphs numbered "1" through "X" as if set forth fully herein.

86.    At all times herein mentioned, the Plaintiffs fully complied with their duties and obligations under the IRONSHORE policy

87.    At all times herein mentioned, the Plaintiffs fully cooperated with IRONSHORE in connection with the subject claim.

88.    At all times herein mentioned, the Plaintiffs timely paid their premiums.

89.    At all times herein mentioned, the Plaintiffs negotiated in good faith.

90.    At all times herein mentioned, the Plaintiffs dealt in good faith.

91.    At all times herein mentioned, the Defendant failed to negotiate in good faith.

92.    The Defendant is in breach of the subject contract of insurance.

93.    Defendant is obligated to defend and indemnify Plaintiffs under the IRONSHORE policy.

94.    Defendant refused its obligations under the IRONSHORE policy.

95.    The Defendant continues to unreasonably disclaim Plaintiffs' claim in bad faith.

96.    Defendant has breached the subject contract of insurance.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

97. As a result of Defendant's breach of the subject insurance contract, Defendant caused the Plaintiffs to incur a default judgment against them in the amount of $1,100,000.00, plus interest.

98. Plaintiffs have been damaged and demand judgment in the amount of at least $1,100,000.00 which resulted from Defendant's breach of the subject insurance contract.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Breach of Covenant of Good Faith and Fair Dealing)

99. Plaintiffs repeat and reallege each and every allegation contained in all paragraphs numbered "1" through "X" as if set forth fully herein.

100. At all times herein mentioned, the Plaintiffs fully complied with their duties and obligations under the subject IRONSHORE policy.

101. At all times herein mentioned, the Plaintiff fully cooperated with IRONSHORE in its investigation of this claim.

102. At all times herein mentioned, the Plaintiffs timely paid their premiums.

103. At all times herein mentioned, the Plaintiffs negotiated in good faith.

104. At all times herein mentioned, the Defendant failed to negotiate in good faith.

105. At all times herein mentioned, the conditions requiring Defendant's performance had occurred.

106. At all times herein mentioned, Defendant unfairly interfered with Plaintiffs rights to receive the benefits under the subject policy of insurance.

107. At all times herein mentioned, Plaintiffs have been and continue to be harmed by Defendant's conduct.

108. The Defendant is in breach of the covenant of good faith and fair dealing.

109. Defendant has acted in conscious and deliberate disregard of Plaintiffs' interests.

110. The defendant continues to unreasonably disclaim Plaintiffs' claim in bad faith.

111. Plaintiffs are entitled to compensatory damages from Defendant in the amount of at least $1,100,000.00, plus costs and interest, including pre-judgment interest, as well as punitive damages.

112. Defendant's conduct in improperly disclaiming coverage is egregious and punitive damages are necessary to deter Defendant from engaging in such capricious bad-faith denials of coverage in the future.

### AS AND FOR A SEVENTH CAUSE OF ACTION

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(Ironshore's Failure To Honor Its Duties, Bad Faith, and Unfair Claims Practices)

113.. Plaintiffs have incurred costs and fees, including but not limited to attorney fees, based on Defendant's failure to honor its duties and responsibilities under the insuring agreement.

114. Plaintiffs have incurred costs and fees, including but not limited to attorney fees, due to Defendant's improper, defective and untimely disclaimer.

115. Defendant's behavior amounts to bad faith.

116. Defendant's behavior amounts to unfair claims practices

117. New York law allows insureds to be reimbursed by their insurer, when an insurer fails to honor its duties and responsibilities.

118. New York law allows insureds to be reimbursed by their insurer, when an insurer engages in bad faith.

119. New York law allows insureds to be reimbursed by their insurer, when an insurer enages in unfair claims practices.

120. Plaintiffs are entitled to compensatory damages from Defendant in the amount of at least $1,100,000.00, plus costs and interest, including pre-judgment interest, as well as punitive damages.

WHEREFORE, Plaintiffs respectfully request:

(1)   As against Defendant on the First, Second and Third Causes of Action, a declaration that:

   (a)   Defendant IRONSHORE must defend WHITE OAKS in the lawsuit commenced against it by McDONNELL in Supreme Court, Nassau County, under Index Number 500016/23, including, but not limited to moving to vacate the default judgment obtained against WHITE OAKS in the lawsuit commenced against it by McDONNELL in Supreme Court, Nassau County, under Index Number 500016/23;

   (b)   Defendant IRONSHORE must indemnify WHITE OAKS in the lawsuit commenced against it by McDONNELL in Supreme Court, Nassau County, under Index Number 500016/23;

**Page 14 of 15**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

    (2)    As against Defendant on the Fourth Cause of Action:

          (a)    An award of attorney fees, along with all costs, fees, reimbursements, disbursements, and any other expenses, incurred by Plaintiffs in this action;

    (3)    As against Defendant on the Fifth Cause of Action:

          (a)    Awarding Plaintiffs Judgment in an amount to be determined at trial or on inquest, but not less than $1,100,000.00, together with interest, including pre-judgment interest;

    (4)    As against Defendant on the Sixth and Seventh Causes of Action:

          (a)    Awarding Plaintiffs Judgment in an amount to be determined at trial or on inquest, but not less than $1,100,000.00, together with interest, including pre-judgment interest, and punitive damages,

Together with awarding Plaintiffs such other, further, and different relief as the Court deems just and proper under the circumstances.

Dated: Garden City, New York
      January 29, 2025

McDONNELL ADELS & KLESTZICK, PLLC

By:    EVAN W KLESTZICK, ESQ.
       Attorneys for Plaintiffs
       401 Franklin Avenue
       Garden City, New York 11530
       (516) 328-3500
       Our File No.: MAG-406(a)dj

**Page 15 of 15**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/31/2025

## VERIFICATION

JEFFREY H. WHITE affirms that the following statements are true under penalties of perjury:

I am a plaintiff in this action. I have read the foregoing Summons and Verified Complaint, know the contents thereof, and that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters deponent believes it to be true. The grounds of deponent's belief as to all matters stated upon deponent's knowledge are as follows: books, records, correspondence, investigation and conversations and other documentation in the possession of the undersigned.

I affirm, this 30 day of January, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: Delray Beach, Florida
January 30, 2025

JEFFREY H. WHITE

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

# Exhibit "A"

# EXHIBIT "A"

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

**⁂ IRONSHORE.**
A Liberty Mutual Company

Ironshore Insurance Services LLC.
A subsidiary of Ironshore Holdings (U.S.) Inc.
970 Lake Carillon Drive
Suite 300
St. Petersburg, FL 33716

May 3, 2023

Laurie Pelkey
ONEGROUP NY INC
706 North Clinton Street
Syracuse, NY 13204

**Re:** Jeffrey H and The Estate of Eleanor White
8565 Jericho Turnpike
Woodbury, NY 11797

**Line Of Business:** LTC - Primary

**Policy Number:** HC7PACIKF1002

**Policy Term:** 4/22/2023 TO 4/22/2024

Dear Laurie:

Enclosed please find the policy for the above referenced account. We appreciate your consideration of Ironshore.
Feel free to contact me with any questions or concerns.

Sincerely,

Michael Kraus
Production Specialist
Ironshore Insurance Services LLC.
Office: +1 (813) 302-4219
Mobile: +1 (914) 204-7062
Email: Michael.kraus@ironshore.com

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



**IRONSHORE.**
A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE DEPARTMENT OF FINANCIAL SERVICES PERTAINING TO POLICY FORMS.**

## LONG TERM CARE ORGANIZATIONS PROFESSIONAL LIABILITY, GENERAL LIABILITY, EMPLOYEE BENEFITS LIABILITY AND REGULATORY PROCEEDING DEFENSE COVERAGE DECLARATIONS

THIS IS A CLAIMS MADE LIABILITY POLICY – PLEASE READ THE ENTIRE POLICY CAREFULLY.

**Policy Number: HC7PACIKF1002**

| ITEM 1. NAMED INSURED AND PRINCIPAL ADDRESS | ITEM 2. POLICY PERIOD |
|---|---|
| Jeffrey H and The Estate of Eleanor White<br>8565 Jericho Turnpike<br>Woodbury, NY 11797 | (a) **Inception Date:** April 22, 2023<br>(b) **Expiration Date:** April 22, 2024<br>At 12:01 a.m. Standard Time both dates at the Principal Address stated in ITEM 1. |

**ITEM 3. RETROACTIVE DATES**

| | | |
|---|---|---|
| A) | Professional Liability: | April 22, 2007 |
| B) | General Liability: | April 22, 2007 |
| C) | Employee Benefits Liability: | April 22, 2007 |
| D) | Evacuation Expense Reimbursement : | April 22, 2022 |
| E) | Public Relations Expense Reimbursement : | April 22, 2022 |
| F) | Resident Loss of Property Reimbursement : | April 22, 2022 |
| G) | Regulatory Proceedings: | April 22, 2022 |

**ITEM 4. LIMITS OF LIABILITY**

A) **Professional Liability**

| | |
|---|---|
| Each Claim Limit of Liability: | $1,000,000 |
| Aggregate Limit of Liability: | $3,000,000 |
| Each Claim Self Insured Retention: | $50,000 |
| Aggregate Self Insured Retention: | $0 |

LTC.DEC.025 (4.17 ed.)                                                                 Page 1 of 4

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

**B) General Liability**

| | |
|---|---|
| Each Claim Limit of Liability: | $1,000,000 |
| Aggregate Limit of Liability: | $3,000,000 |
| Products Completed Ops Limit: | ☒ Included |
| Personal Injury and Advertising Injury Limit: | ☒ Included |
| Fire Damage Each Claim: | $100,000 |
| Fire Damage Aggregate: | $100,000 |
| Medical Expense for Bodily Injury caused by accident Each Person: | $10,000 |
| Medical Expense for Bodily Injury caused by accident Aggregate | $25,000 |
| Each Claim Self Insured Retention: | $50,000 |
| Aggregate Self Insured Retention: | $0 |
| Medical Expenses Self Insured Retention: | $0 |

**C) Employee Benefits Liability**

| | |
|---|---|
| Each Claim Limit of Liability: | $1,000,000 |
| Aggregate Limit of Liability: | $3,000,000 |
| Each Claim Self Insured Retention: | $1,000 |
| Aggregate Self Insured Retention: | $0 |

**D) Evacuation Expense Reimbursement**

| | |
|---|---|
| Each Claim Limit of Liability: | $25,000 |
| Aggregate Limit of Liability: | $25,000 |
| Each Claim Self Insured Retention: | $5,000 |
| Aggregate Self Insured Retention: | $0 |

**E) Public Relations Expense Reimbursement**

| | |
|---|---|
| Each Claim Limit of Liability: | $25,000 |
| Aggregate Limit of Liability: | $25,000 |
| Each Claim Self Insured Retention: | $5,000 |
| Aggregate Self Insured Retention: | $0 |

**F) Resident Loss of Property Reimbursement**

| | |
|---|---|
| Each Claim Limit of Liability: | $5,000 |
| Aggregate Limit of Liability: | $25,000 |
| Each Claim Self Insured Retention: | $0 |
| Aggregate Self Insured Retention: | $0 |

**G) Regulatory Proceedings (Defense Expenses Only)**

| | |
|---|---|
| Each Claim Limit of Liability: | $250,000 |
| Aggregate Limit of Liability: | $250,000 |
| Each Claim Self Insured Retention: | $50,000 |
| Aggregate Self Insured Retention: | $0 |

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM          INDEX NO. 602409/2025

NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 01/31/2025

---

**ITEM 5. PREMIUM:**

*Compliance with all surplus lines placement requirements, including stamping the Policy and collection and payment of surplus lines taxes, is the responsibility of the broker.*

| | |
|---|---|
| Professional Liability: | $395,738.00 |
| General Liability: | $36,762.00 |
| Terrorism Coverage (TRIA): | $0.00 |
| **Total Amount Due:** | **$432,500.00** |

*See Invoice for the date Premium is due and payable. Failure to pay the premium in full may result in voidance of coverage.*

☐ This amount is net of commission – no percentage of the premium will be paid to the broker.
☒ This amount includes commission – a percentage of the premium will be paid to the broker.

**ITEM 6. NOTICES UNDER SECTION IV OF THE POLICY SHOULD BE ADRESSED TO:**

Notice of a claim for coverage (including potential claims) or any supplemental notice regarding a previously noticed claim or potential claim:

USCLAIMS@IRONSHORE.COM

All other notices under the Policy:
Underwriting Department
Ironshore Healthcare
175 Powder Forest Drive
Weatogue, CT 06089

**ITEM 7. POLICY FORM & ENDORSEMENTS ATTACHED AT ISSUANCE**

LTC.COV.025 (4.17 ed.) Long Term Care Organizations Professional Liability, General Liability, Employee Benefits Liability And Regulatory Proceeding Defense

**ENDORSEMENTS ATTACHED AT ISSUANCE**

1. ADM-OFAC-0419 – Sanction Limitation and Exclusion Clause
2. IRON.END.ALL.017 NY (1119) New York Liability State Amendatory Endorsement
3. LTC.P.009 (3.09 Ed.) Schedule of Locations with Retroactive Dates
4. LTC.P.012 (3.09 Ed.) Amend Definition of Named Insured
5. LTC.P.080 (10.09 Ed.) Minimum Earned Premium
6. LTC.END.207 (7.16 ed.) Pre-Approved Counsel Endorsement
7. LTC.END.237 (4.17 ed.) Class Action Exclusion
8. LTC.END.242 (4.17 ed.) Disinfection Event Expense Reimbursement Coverage
9. LTC.END.317 (11.19 ed.) Cyber Liability Exclusion - Long Term Care
10. LTC.END.327 (3.20 ed.) Blanket Additional Insured - GL, Primary and Non-Contributory
11. LTC.END.347 (11.20 ed.) Amend Claims Made General Liability Provisions
12. LTC.END.356 (4.21 ed.) Pandemic Epidemic Scheduled Infectious Disease Exclusion
13. TRIA-E002-0315 Cap on Losses From Certified Acts of Terrorism
14. TRIA-N004-0420 Disclosure - Terrorism Risk Insurance Act
15. Service of Suit Clause - New York - SC-11 (11_18)

---

These Declarations, the completed signed Application and the Policy with Endorsements shall constitute the contract between the Insured and the Underwriter.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

Ironshore Specialty Insurance Company by:

Secretary

President

May 3, 2023
Date

LTC.DEC.025 (4.17 ed.)

Page 4 of 4

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

# ⁂ IRONSHORE.
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Insured Name:** Jeffrey H and The Estate of Eleanor White
**Policy Number:** HC7PACIKF1002

## LONG TERM CARE ORGANIZATIONS PROFESSIONAL LIABILITY, GENERAL LIABILITY, EMPLOYEE BENEFITS LIABILITY AND REGULATORY PROCEEDING DEFENSE COVERAGE POLICY

**PORTIONS OF THIS POLICY ARE "CLAIMS MADE," APPLYING ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurance company identified in the Declarations to this Policy (the "Insurer"), and subject to all of the terms and conditions of this Policy (including all endorsements hereto), the Insurer and the Insured agree as follows:

**I.    INSURING AGREEMENTS**

**(A)    Claims Made Professional Liability Insurance:**

The Insurer will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**, provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

**(B)    Claims Made General Liability Insurance; Medical Expense Payments:**

**(1)**    The Insurer will pay on behalf of the Insured any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** happening on or after the **Retroactive Date**, provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

**(2)**    The Insurer will pay on behalf of the Insured **Medical Expenses** which are actually incurred, and for which the claimant is financially responsible, for **Bodily Injury** caused by an accident:

(a)    on premises owned or rented by the **Named Insured**; or

(b)    on ways adjacent to premises owned or rented by the **Named Insured**; or

(c)    because of the operations of the **Named Insured**;

*provided* that:

(i)    such accident takes place in the coverage territory and during the **Policy Period**;

LTC.COV.025 (4.17 ed.)                                                                                              Page: 1 of 25

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

        (ii)  **Medical Expenses** are incurred and reported to the **Insurer** within one year of the date of the accident; and

        (iii)  the injured person submits to examination, as often as required by the **Insurer**, by physicians of the **Insurer's** choice and at the expense of the **Insurer**.

**(C)**    **Claims Made Employee Benefits Liability Insurance:**

The **Insurer** will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for an **Employee Benefits Wrongful Act** happening on or after the **Retroactive Date**, provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable **Limit of Liability**.

**(D)**    **Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the **Insurer** will reimburse the **Named Insured** up to the amount set forth in **ITEM 4(D)** of the Declarations for **Evacuation Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with an **Evacuation** occurring after the **Retroactive Date**.

**(E)**    **Public Relations Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the **Insurer** will reimburse the **Named Insured** up to the amount set forth in **ITEM 4(E)** of the Declarations for **Public Relations Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with a **Public Relations Event** occurring after the **Retroactive Date**, provided that the **Insurer** will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Public Relations Event**.

**(F)**    **Resident Loss of Property Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the **Insurer** will reimburse the **Named Insured** up to the amount set forth in **ITEM 4(F)** of the Declarations for **Resident Loss of Property** actually paid by the **Named Insured** during the **Policy Period**.

**(G)**    **Claims Made Regulatory Proceeding Defense Coverage:**

The **Insurer** will reimburse the **Named Insured** for **Defense Expenses** incurred by the **Insured** as a result of an **Eligible Regulatory Proceeding** first instituted against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, subject to the Limit of Liability set forth in **ITEM 4(G)** of the Declarations

**(H)**    **Duty to Defend and Supplementary Payments:**

The **Insurer** has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent. In addition to the applicable Limit of Liability for INSURING AGREEMENTS (A), (B), and (C), the **Insurer** will pay **Defense Expenses** and will:

    (1)  pay the premium on any bond to release attachments for an amount not in excess of the Limit of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the **Insurer** will not be obligated to apply for or furnish any such bond;

    (2)  pay all costs taxed against the **Insured** in any such suit;

    (3)  provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

        (a)  the dispute at issue is a **Claim** covered by this Policy, and

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

     **(b)**   the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (A)(3) of this **Policy**; and

  **(4)**   pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the **Insurer's** request, but not to exceed:

     **(a)**   $500 per day per **Insured**; and

     **(b)**   $12,500 per **Claim**.

**(I)**   **Defense and Settlement:**

  **(1)**   No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim**, or incur any **Defense Expenses** for an **Eligible Regulatory Proceeding**, without the **Insurer's** written consent. With respect to any **Claim**, the **Insurer** will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The **Insurer** may make any settlement of any **Claim** which it deems appropriate.

  **(2)**   The **Insurer** will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable **Limit of Liability** has been exhausted by the payment of **Loss** (or **Defense Expenses** with respect to any **Eligible Regulatory Proceeding**). If the applicable **Limit of Liability** is exhausted by the payment of **Loss** (or **Defense Expenses** with respect to any **Eligible Regulatory Proceeding**), the premium for this **Policy** will be fully earned.

  **(3)**   If both **Loss** covered by this **Policy** and **Loss** not covered by this **Policy** are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**," the **Named Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of all such amounts. The **Insurer's** obligation to pay **Loss** under this **Policy** shall relate only to those sums allocated to the **Insureds**. In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Named Insured** and others. In the event that the **Insurer** and the **Named Insured** do not reach an agreement with respect to an allocation, then the **Insurer** shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this **Policy** and applicable law.

**II.**   **DEFINITIONS APPLICABLE TO ALL COVERAGE PARTS**

**(A)**   **"Administration"** as used in connection with **Employee Benefits Programs** shall mean the following acts if authorized by the **Named Insured**:

  **(1)**   giving counsel to **Employees** with respect to **Employee Benefits Programs**;

  **(2)**   interpreting the **Employee Benefits Programs**;

  **(3)**   handling records and processing of **Claims** in connection with the **Employee Benefits Programs**; and

  **(4)**   effecting enrollment, termination or cancellation of **Employees** under **Employee Benefits Programs**.

**(B)**   **"Advertising Injury"** means injury arising out of an **Advertising Injury Offense**.

**(C)**   **"Advertising Injury Offense"** means one or more of the following offenses:

  **(1)**   oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services;

(2)     oral or written publication of material that violates a person's right of privacy;

(3)     misappropriation of advertising ideas or style of doing business; or

(4)     false, incorrect or misleading publication by the Named Insured concerning the type, scope or quality of Medical Services offered by the Named Insured, alleged in connection with Bodily Injury.

(D)     **"Application"** means the application for insurance attached to and forming part of this Policy, including any materials submitted and statements made in connection therewith, all of which are on file with the Insurer and are a part of this Policy, as if physically attached. If the Application uses terms or phrases that differ from terms defined in this Policy, no inconsistency between any terms or phrase used in the Application and any term defined in this Policy will waive or change any of the terms, conditions and limitations of this Policy.

(E)     **"Beauticians and Barbers Professional Services"** means those services rendered by any **Covered Beautician/Barber** in his or her capacity as such.

(F)     **"Beauticians and Barbers Professional Services Wrongful Act"** means any actual or alleged act, error or omission, or series of acts, errors or omissions, by a **Covered Beautician/Barber** in the performance or failure to perform **Beauticians and Barbers Professional Services** that results in **Bodily Injury to a Resident;**

(G)     **"Bodily Injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(H)     **"Claim"** means any written notice received by an **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act** committed or allegedly committed on or after the applicable **Retroactive Date. Claim** does not include a **Regulatory Proceeding.**

(I)     **"Covered Beautician/Barber"** means any licensed beautician or barber who is not an **Employee** of the Named **Insured** but who is invited by the Named **Insured** onto the Named **Insured's** premises to perform **Beauticians and Barbers Professional Services,** but only while performing such **Beauticians and Barbers Professional Services** at the request of the **Named Insured** on the Named **Insured's** premises;

(J)     **"Covered Contract"** means any lease of premises; sidetrack agreement; elevator maintenance agreement; easement of license agreement; obligation to indemnify a municipality if the obligation is required by ordinance; contract or agreement under which the Named **Insured** assumes the tort liability of a municipality to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(K)     **"Defense Expenses"** means reasonable fees and expenses of attorneys, experts and consultants incurred in the investigation, adjustment, defense and/or appeal of a **Claim** or an **Eligible Regulatory Proceeding** with the approval or at the direction of the Insurer; provided that **Defense Expenses** shall not include:

(1)     remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of any **Insured;**

(2)     any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless whether such other insurer undertakes such duty; or

(3)     any benefits under an **Employee Benefits Program.**

(L)     **"Eligible Regulatory Proceeding"** means a Regulatory Proceeding that includes allegations of **Bodily Injury** to one or more person(s) as a result of a **Professional Services Wrongful Act(s)** committed or allegedly committed on or after the applicable **Retroactive Date.**

(M)     **"Employee"** means any person who has an assigned work schedule for and is either (i) on the regular payroll of the Named **Insured,** with federal and state taxes withheld, or (ii) a person employed by a labor leasing firm or self-employed, and leased by the Named **Insured** under a written agreement with such labor leasing firm or person to

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

perform duties at the Named Insured's location and under the direction of the Named Insured. Other than a person described in clause (ii) above, independent contractors are not Employees. An Employee's status as an Insured shall be determined as of the date of the Wrongful Act upon which a Claim involving the Employee is based.

(N) "Employee Benefits Programs" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, Employee stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the Administration of the Named Insured.

(O) "Employee Benefits Wrongful Act" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by any Insured in the Administration of an Employee Benefits Program.

(P) "Employment Practices" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of Employees; evaluation of Employees; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former Employee or applicant for employment; humiliation or defamation of any present or former Employee or applicant for employment; retaliatory treatment against an Employee arising out of the Employee's attempted or actual exercisof the Employee's rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

(Q) "Evacuation" means the removal from one or more of the Named Insured's facilities to any other location of a majority of the Residents of such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the Named Insured's management, causes or could potentially cause such facility(ies) to be unsafe for such Residents.

(R) "Evacuation Expense" means reasonable costs incurred in connection with an Evacuation, including costs associated with transporting and lodging Residents who have been evacuated. Evacuation Expense does not include any remuneration, salaries, overhead or benefit expenses of the Named Insured.

(S) "Extended Reporting Period" means the period of time after the Policy Period for reporting any Claim for a Wrongful Act that happened after the Retroactive Date and before the termination of the Policy Period.

(T) "Fire Damage" means Property Damage resulting from a Hostile Fire.

(U) "First Named Insured" means the entity designated as such in ITEM 1 of the Declarations.

(V) "Government Agency" means any federal or state governmental entity or agent acting with legal authority to implement, administer and/or enforce particular legislation, including but not limited to statutes, regulations, directives and bulletins.

(W) "HIPAA Violation" means any proceeding brought by a Government Agency (other than proceedings in the ordinary course of the Named Insured's business) alleging a violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

(X) "Hostile Fire" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that Hostile Fire does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(Y) "Insured" means any of the following:

(1)    the **Named Insured**;

(2)    any **Employee** or **Volunteer**; but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such for the **Named Insured**;

(3)    any medical director of the **Named Insured**, whether or not such person is an **Employee**;

(4)    any member of a duly authorized board or any committee of the **Named Insured**; any person communicating information to the **Named Insured** or its medical or professional staff for the purpose of aiding in the evaluation of **Professional Services** or the qualifications, professional competence, fitness, or character of an applicant for membership or privileges on such medical or professional staff or for purposes of initiating corrective action; or any person charged with the duty of acting as a hearing officer or an agent of a judicial review committee or executing directives of any such board or committee but, in each case, only when such person is acting within the capacity and scope of his or her duties to such board or committee;

(5)    any **Covered Beautician/Barber**;

(6)    solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured** the estates, heirs, legal representatives or assigns of such individual **Insured**;

(7)    any person enrolled as a student in a formal training program offered by the **Named Insured** or a subsidiary or an affiliate in connection with the **Named Insured's** on-site operation as a health care organization or provider but only for such person's legal liability arising from the performance of, or failure to perform, duties relating to the on-site training program in which he or she is enrolled;

(8)    any driver or operator of **Mobile Equipment** but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured**; and

(9)    Solely with respect to, and limited to, coverage afforded under INSURING AGREEMENT (B), any person or organization for whom the **Named Insured** is performing operations when the **Named Insured** and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an "additional insured" on this **Policy**; *provided*, that each such person or organization is being afforded coverage under this **Policy** for liability incurred *solely* as a result of the acts, errors or omissions of the original **Insured**; and *provided further*, that no coverage will be available under this **Policy** for any **Claim** based on or arising out of any actual or alleged independent or direct liability of any such person or organization.

(Z)    "**Loss**" means **Public Relations Expenses**, **Evacuation Expenses**, **Medical Expenses** for **Bodily Injury** caused by an accident, and any damages, settlements, judgments or other amounts (including punitive or exemplary damages where insurable by law) in excess of the applicable Retention, if any, stated in ITEM 4 of the Declarations and not exceeding the applicable Limit of Liability stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**. **Loss** shall not include:

(1)    **Defense Expenses**;

(2)    the multiple portion of any multiplied damage award;

(3)    fines, penalties, sanctions, fees, government payments or taxes; except that the **Insurer** will pay fines, penalties, sanctions, fees, government payments or taxes as result of any **HIPAA Violation** up to the amount set forth in ITEM 4E of the Declarations;

(4)    amounts owed to any provider of **Medical Services** under any contract;

(5)    restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

payments, premium or any other funds allegedly wrongfully held or obtained;

(6)    benefits under an **Employee Benefits Plan**;

(7)    relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief; or

(8)    matters which are uninsurable under applicable law.

(AA)   **"Medical Expenses"** means reasonable payments for:

(1)    first aid administered at the time of an accident;

(2)    necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3)    necessary ambulance, hospital, professional medical and nursing, and funeral services.

(BB)   **"Medical Services"** means services performed by an **Insured** in the treatment and/or care of any resident including:

(1)    medical (other than surgical), dental, psychiatric, mental health, chiropractic, osteopathic, nursing, personal, residential or other professional health care;

(2)    the furnishing of food or beverages in connection with such care;

(3)    the furnishing or dispensing of medications, drugs, blood, blood products, or medical (other than surgical), dental, or psychiatric supplies, equipment, or appliances in connection with such care, including on site telemedicine **Resident** monitoring equipment; and

(4)    the handling of, or the performance of post-mortem examinations on, human bodies.

(CC)   **"Mobile Equipment"** means any of the following types of land vehicles, including any attached machinery or equipment:

(1)    bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)    vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)    vehicles that travel on crawler treads;

(4)    vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(a)    power cranes, shovels, loaders, diggers or drills, or

(b)    road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)    vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a)    air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b)    cherry pickers and similar devices used to raise or lower workers; and

(6)    vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos. Mobile Equipment does not include self-propelled vehicles with the

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

following types of permanently attached equipment:

   (a)   equipment designed primarily for:

      (i)   snow removal;

      (ii)   road maintenance but not construction or resurfacing; or

      (iii)   street cleaning;

   (b)   cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (c)   air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

(DD)   "Named Insured" means the First Named Insured and any other entity designated as a Named Insured in ITEM 1 of the Declarations.

(EE)   "Occurrence" means an Advertising Injury Offense, a Personal Injury Offense, and any accident, including continuous or repeated exposure to the same harmful conditions, which results in injury or damage neither expected nor intended by the Insured.

(FF)   "Personal Injury" means injury, other than Bodily Injury, arising out of one or more Personal Injury Offense(s).

(GG)   "Personal Injury Offense" means any of the following offenses:

   (1)   false arrest, detention or imprisonment;

   (2)   malicious prosecution;

   (3)   the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

   (4)   oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

   (5)   oral or written publication of material that violates a person's right of privacy.

(HH)   "Policy Period" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(II)   "Pollutant" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. Pollutant does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the Named Insured.

(JJ)   "Professional Services" means:

   (1)   Medical Services;

   (2)   the activities of an Insured as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee;

   (3)   reviewing the quality of Medical Services or providing quality assurance on behalf of the Named Insured;

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

    (4)    Beauticians and Barbers Professional Services; and

    (5)    General care, control, supervision and providing for safety and security of a person while a Resident of the Insured.

(KK)    "Professional Services Wrongful Act" means:

    (1)    any actual or alleged act, error or omission, or series of acts, errors or omissions, by an Insured in rendering, or failing to render, Professional Services to a Resident that results in Bodily Injury;

    (2)    any Beauticians and Barbers Professional Services Wrongful Act; and

    (3)    any actual or alleged violation by an Insured of any Rights of Residents, that results in Bodily Injury.

(LL)    "Property Damage" means:

    (1)    physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

    (2)    loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the Occurrence that caused it.

(MM)    "Public Relations Expense" means reasonable fees and costs incurred in the investigation, mitigation and/or defense of an actual or alleged Public Relations Event. Public Relations Expense includes costs (a) of attorneys, experts and consultants, including third-party media consultants; (b) to notify third parties directly affected by such Public Relations Event; (c) associated with credit monitoring services; and (d) incurred in the management of public relations with respect to such Public Relations Event. Public Relations Expense does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the Named Insured.

(NN)    "Public Relations Event" means:

    (1)    any HIPAA Violation, or any other failure to maintain the confidentiality of information regarding Medical Services or information obtained in the provision of Professional Services, or unauthorized release or use of such information; or

    (2)    any criminal investigation, criminal complaint, indictment or licensing proceeding relating to an alleged violation or infringement of one or more state or federal statutes or regulations regarding:

        (a)    elder abuse;

        (b)    Resident privacy, including the handling of protected health information;

        (c)    hiring practices and reference checking with respect to potential employees; or

        (d)    any other similar law or regulation applicable to operations of the Named Insured and intended to protect the rights or safety of elderly persons and persons in long-term care facilities;

        in any such case resulting in Bodily Injury.

(OO)    "Regulatory Proceeding" means an action, subpoena, or request for monetary or injunctive relief made by or on behalf of any one or more Government Agency(ies), whether brought in the name of such Government Agency(ies) or by or on behalf of such Government Agency(ies) in the name of any other individual or entity.

(PP)    "Related Claims" means:

LTC.COV.025 (4.17 ed.)

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

    (1)    **Claims for Wrongful Acts, and**

    (2)    **Claims for Bodily Injury, Property Damage, Advertising Injury or Personal Injury caused by Wrongful Acts; and**

    (3)    **Eligible Regulatory Proceedings;**

based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events, whether related logically, causally, or in any other way, in any combination, whether or not involving more than one policy, practice, procedure or product, including any course of treatment, and whether or not deemed a continuous tort. Notwithstanding the foregoing, no **Eligible Regulatory Proceeding** shall be considered a Related Claim to any Claim which is not an **Eligible Regulatory Proceeding.**

(QQ)    **"Resident"** means any person being cared for or residing at a facility of the Named Insured.

(RR)    **"Resident Loss of Property"** means any loss of, or damage to, personal property of a Resident occurring at a facility of the **Named Insured.**

(SS)    **"Retroactive Date"** means the applicable date set forth in ITEM 3 of the Declarations.

(TT)    **"Rights of Residents"** means:

    (1)    any right granted to a nursing home **Resident** under any state law regulating the **Named Insured's** business as a residential health care facility; or

    (2)    rights of **Residents** as set forth in the United States Department of Health and Welfare regulations governing participation of Intermediate Care Facilities or Skilled Nursing Facilities, regardless of whether the **Named Insured's** facility is subject to such regulations.

(UU)    **"Volunteer"** means a person who provides his or her services or labor to the **Named Insured,** and whose activities are supervised and directed by the **Named Insured,** but who does not have a contract to provide and is not compensated for such services and labor. No Insured **Medical Practitioner, Employee** or staff physician shall be considered a **Volunteer.**

(VV)    **'Wrongful Act"** means any **Professional Services Wrongful Act** or **Employee Benefits Wrongful Act.**

III.    **EXCLUSIONS**

(A)    **Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Insurer will not pay any **Loss** or Defense Expenses under INSURING AGREEMENT (A), for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

    (1)    discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment except to the extent that such discrimination relates to the rendering of, or failure to render, **Professional Services;**

    (2)    **Property Damage;**

    (3)    **Bodily Injury** expected or intended from the standpoint of any **Insured;** except this EXCLUSION (A)(3) will

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

not apply

    (a)   to Bodily Injury resulting from use of reasonable force to protect persons or property, and

    (b)   In the event of any Claim for elder abuse and/or sexual misconduct, to

        (i)   any Insured who did not personally participate in such elder abuse or sexual misconduct, and

        (ii)   the vicarious liability of the Named Insured for such elder abuse or sexual misconduct.

**(4)**   Advertising Injury or Personal Injury, except (a) to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**, and (b) with respect to any **Advertising Injury Offense** described in DEFINITION (C)(4).

**(5)**   **Employee Benefits Wrongful Acts;**

**(6)**   rendering of, or failure to render, **Medical Services** by any Insured while the Insured's license to practice is or was not active;

**(7)**   violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (A)(7) will not apply to any Claim arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations; or

**(8)**   **Regulatory Proceeding**

**(B)**   **Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Insurer will not pay any Loss or **Defense Expenses** under INSURING AGREEMENT (B), for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

**(1)**   **Professional Services Wrongful Act;**

**(2)**   discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment;

**(3)**   **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any Insured; except this EXCLUSION (B)(3) will not apply

    (a)   to Bodily Injury resulting from use of reasonable force to protect persons or property, and

    (b)   In the event of any Claim for alleged sexual misconduct, to

        (i)   any Insured who did not personally participate in such sexual misconduct, and

        (ii)   the vicarious liability of the Named Insured for such sexual misconduct.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(4)     Personal Injury or Advertising Injury arising out of oral or written publication of material:

    (a)     if done by or at the direction of an Insured with knowledge of its falsity; or

    (b)     whose first publication took place before the Inception Date set forth in ITEM 2 of the Declarations;

(5)     Advertising Injury arising out of any false, incorrect or misleading description of the price of goods, products or services;

(6)     Employee Benefits Wrongful Acts;

(7)     Bodily Injury or Property Damage arising out of:

    (a)     the ownership, maintenance, use, operation or entrustment to others of any aircraft, auto, watercraft, motor vehicle or semi-trailer or the loading or unloading thereof; except to the extent such injury arises from the loading or unloading of Residents or relates to the maintenance or use of non-owned aircraft, watercraft or motor vehicles but only as excess cover over any other insurance, whether collectible or not;

    (b)     the transportation of Mobile Equipment by, in or on an auto owned or operated by, or rented or loaned to, any Insured;

    (c)     the use of Mobile Equipment in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity; or

    (d)     any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

    except that EXCLUSION (B)(7)(a) above does not apply to golf carts or similar vehicles owned or leased by the Named Insured, and operated by any Employee or Volunteer of the Named Insured (i) in the ordinary course of the Named Insured's business as a retirement facility or community, and (ii) solely on premises owned or leased by the Named Insured;

(8)     Property Damage to:

    (a)     property the Insured owns, rents or occupies;

    (b)     premises sold, given away or abandoned by the Named Insured, if the Property Damage arises out of any part of those premises;

    (c)     property loaned to the Insured;

    (d)     personal property in the care, custody or control of the Insured, subject, however, to coverage afforded under INSURING AGREEMENT (F);

    (e)     that particular part of real property on which the Insured, or any contractor or subcontractor working directly or indirectly on the Insured's behalf, is performing operations, if the Property Damage arises out of those operations;

    (f)     property which is being transported by the Insured by automobile, Mobile Equipment or team, including the loading and unloading thereof; or

    (g)     a delay or failure by an Insured or anyone acting on the Named Insured's behalf to perform a contract or an agreement in accordance with its terms;

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

except that:

EXCLUSION (B)(8)(a) above does not apply to Fire Damage, subject to the applicable Limit of Liability set forth in ITEM 4 of the Declarations; and

EXCLUSIONS (B)(8)(c), (d) and (e) above do not apply to liability assumed under a sidetrack agreement.

(9)   injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

(a)   airborne as a fiber or particle;

(b)   contained in a product;

(c)   carried or transmitted on clothing or by any other means; or

(d)   contained in or a part of:

     (i)   any building;

     (ii)   any building material;

     (iii)   any insulation product; or

     (iv)   any component part of any building, building material or insulation product;

(10)  (a)   exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

(b)   fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**;

(c)   fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any **Pollutant**;

except this EXCLUSION (B)(10) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**;

(11)  violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (B)(11) will not apply to a **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations;

(12)  nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance;

(13)  **Bodily Injury** sustained by:

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(a)    any Insured other than a **Volunteer;**

(b)    any person hired to do work for or on behalf of any Insured or tenant of any Insured;

(c)    any person injured on that part of premises owned or rented by the **Named Insured** that the person normally occupies;

(d)    any person injured while engaging in athletic activities; or

(e)    any person to the extent that benefits for the injury are payable or must be provided by worker's compensation, disability, government-sponsored health insurance (including, without limitation, Medicare and Medicaid) or any similar health insurance plan or coverage; provided that clause (e) shall not be construed to reduce or eliminate the insurer's obligation to satisfy valid government liens via payment directly to the applicable government agency;

except this EXCLUSION (B)(13) shall apply only to the coverage afforded under clause (2) of INSURING AGREEMENT (B);

(14)    **Regulatory Proceeding;** or

(15)    **Bodily Injury** sustained by a **Resident.**

(C)    **Exclusions Applicable to INSURING AGREEMENT (C):**

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the insurer will not pay any **Loss** or **Defense Expenses** under INSURING AGREEMENT (C), for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    **Bodily Injury** or **Property Damage;**

(2)    failure of performance by any insurer;

(3)    failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(3), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(4)    insufficiency of funds to meet any obligations of **Employee Benefits Programs;**

(5)    discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment;

(6)    **Professional Services Wrongful Acts;**

(7)    violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; or

(8)    **Regulatory Proceeding.**

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(D)    **Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Insurer will not pay **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    **Wrongful Act or Occurrence** that happened before the **Retroactive Date** if applicable, or after the **Retroactive Date** if, on the Inception Date of this Policy, the **Insured** knew, had been told, should have known or had notified a prior Insurer or administrator of any other risk transfer instrument that such **Wrongful Act or Occurrence** would or could result in a **Claim** or **Regulatory Proceeding**; *provided, however,* that if this Policy is a renewal of one or more policies previously issued by the Insurer to the **Named Insured,** and the coverage provided by the Insurer to the **Named Insured** was in effect, without interruption, for the entire time between the Inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Insurer began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(2)    violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Professional Services;**

(3)    dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by any **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(4)    obligation for which the **Named Insured** or any other Insurer may be liable under workers' compensation, unemployment compensation, disability benefits or any similar law;

(5)    obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(5) will not apply to:

(a)    liability an **Insured** would have had in the absence of such contract or agreement; or

(b)    liability assumed by the **Named Insured** under a **Covered Contract;**

(6)    **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured;**

(7)    **Employment Practices;**

(8)    liability of any subsidiary as described in GENERAL CONDITION (F) or its **Insured Persons** acting in their capacity as such for any **Claim, Occurrence, Regulatory Proceeding,** fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims, Occurrences, Regulatory Proceedings,** facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became a subsidiary;

(9)    (a)    access to, collection of, release of, disclosure of any person's or organization's confidential or personal information, including patient's lists, financial information, credit card information, health or medical information or any other type of nonpublic information; including but not limited to violations of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any amendments thereto, whether the claim is made by or on behalf of a private individual, entity, or government agency; or

(b)  loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "Electronic Data" (as defined below);

except this EXCLUSION (D)(9) will not apply to the coverage afforded under INSURING AGREEMENT (E). For purposes of this EXCLUSION, the term "Electronic Data" means any information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are or may be used with electronically controlled equipment or other electronic backup facilities, and data transmission or storage by means of the internet. "Electronic Data" is not tangible property.

(10)  liability of any individual acting as an independent contractor for an Insured; except this EXCLUSION (D)(10) will not apply to (a) liability of any medical director of the Named Insured, and (b) any Claim based upon the actual or alleged vicarious liability of an Insured;

(11)  infringement of any right of patent, service mark, trademark, copyright, title or slogan;

(12)  fungi or bacteria, including mold or mildew, any mycotoxins, toxins, allergens, spores, scents, vapors, gases or by-products released by fungi, regardless of whether such fungi is airborne, in soil or water or contained in or a part of any building, structure, building material, or any component part of any of the foregoing; or

(13)  violation of the federal Telephone Consumer Protection Act (TCPA), including any rules or regulations amendment of or additions thereof, or equivalent state or local laws.

## IV.    GENERAL CONDITIONS

### (A)    Limits of Liability

(1)  Insuring Agreement (A) – Professional Liability

(a)  The "Each Claim" amount stated in ITEM 4(A) of the Declarations will be the Insurer's maximum Limit of Liability for all Loss resulting from each Claim or Related Claims for which this Policy provides coverage under INSURING AGREEMENT (A).

(b)  The "Aggregate for all Claims" amount stated in ITEM 4(A) of the Declarations will be the Insurer's maximum Limit of Liability for all Loss resulting from all Claims or Related Claims for which this Policy provides coverage under INSURING AGREEMENT (A).

(2)  Insuring Agreement (B) – General Liability; Medical Expenses

(a)  The applicable "Each Claim" (or "Each Person") amount stated in ITEM 4(B) of the Declarations:

(i)  With respect to General Liability, Personal Injury and Advertising Injury, will be the Insurer's maximum Limit of Liability for all Loss resulting from each Claim or Related Claims under any such coverage for which this Policy provides coverage under INSURING AGREEMENT (B);

(ii)  With respect to Fire Damage, will be the Insurer's maximum Limit of Liability for all Loss resulting from each Claim or Related Claims under such Fire Damage coverage for which this Policy provides coverage under INSURING AGREEMENT (B); and

(iii)  With respect to Medical Expenses for Bodily Injury caused by an accident, will be the Insurer's maximum Limit of Liability for all such Medical Expenses per person resulting from an accident for which this Policy provides coverage under INSURING AGREEMENT (B).

(b)  The applicable "Aggregate" amount stated in ITEM 4(B) of the Declarations:

(i)  With respect to General Liability, Personal Injury and Advertising Injury, will be the Insurer's

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

maximum Limit of Liability for all Loss resulting from all Claims or Related Claims under all such coverages for which this Policy provides coverage under INSURING AGREEMENT (B);

    (ii) With respect to **Fire Damage**, will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** under such **Fire Damage** coverage for which this Policy provides coverage under INSURING AGREEMENT (B); and

    (iii) With respect to **Medical Expenses** for **Bodily Injury** caused by an accident, will be the Insurer's maximum Limit of Liability for all such **Medical Expenses** resulting from all such accidents for which this Policy provides coverage under INSURING AGREEMENT (B).

  (c) The amounts applicable to **Fire Damage** and **Medical Expenses** for **Bodily Injury** caused by an accident, as set forth above, shall be part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability set forth in clause b.1. above.

  **(3)** Insuring Agreement (C) — Employee Benefit Liability

    (a) The "Each Claim" amount stated in ITEM 4(C) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

    (b) The "Aggregate for all Claims" amount stated in ITEM 4(C) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

  **(4)** Insuring Agreement (D) — Evacuation Expense

    (a) The "Each Claim" amount stated in ITEM 4(D) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (D).

    (b) The "Aggregate for all Claims" amount stated in ITEM 4(D) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (D).

  **(5)** Insuring Agreement (E) — Public Relations Expense

    (a) The "Each Claim" amount stated in ITEM 4(E) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (E).

    (b) The "Aggregate for all Claims" amount stated in ITEM 4(E) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (E).

  **(6)** Insuring Agreement (F) — Resident Loss of Property

    (a) The "Each Claim" amount stated in ITEM 4(F) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (F).

    (b) The "Aggregate for all Claims" amount stated in ITEM 4(F) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (F).

  **(7)** Insuring Agreement (G) — Regulatory Proceedings

LTC.COV.025 (4.17 ed.)

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(a)  The "Each Claim" amount stated in ITEM 4(G) of the Declarations will be the Insurer's maximum Limit of Liability for all Defense Expenses resulting from each Regulatory Proceeding for which this Policy provides coverage under INSURING AGREEMENT (G).

(b)  The "Aggregate for all Claims" amount stated in ITEM 4(G) of the Declarations will be the Insurer's maximum Limit of Liability for all Defense Expenses resulting from all Regulatory Proceedings for which this Policy provides coverage under INSURING AGREEMENT (G).

(8)  Each Limit of Liability described in paragraphs (1) through (7) above shall apply regardless of the time of payment by the Insurer, the number of persons or entities included within the definition of "insured," or the number of claimants, and regardless of whether such Claim or Related Claims is/are first made during the Policy Period or during any Extended Reporting Period.

(9)  The Insured shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Insurer's obligation to pay Loss or Defense Expenses under this Policy shall be excess of such deductible or self-insured retention. The applicable deductible or self-insured retention shall apply to each Claim or Related Claims or Eligible Regulatory Proceeding (subject to the applicable aggregate deductible or self-insured retention amount, if any. The Insurer shall have no obligation whatsoever, either to the Insured or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the Insured. The Insurer shall, however, at its sole discretion, have the right and option to do so, in which event the Insured will repay the Insurer any amounts so paid.

(10)  All Insureds under this Policy share the Limit of Liability. In no event will the number of Insureds involved in a Claim or Related Claims increase the Limit of Liability.

(11)  If any Claim made against the Insured gives rise to coverage both under this Policy and under any other policy or policies issued by the Insurer or any affiliate of the Insurer, the Insurer's and, if applicable, such affiliate's maximum aggregate limit of liability under all such policies for all Loss in respect of such Claim will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Insurer respond to a Claim.

(12)  In the event a Claim made against the Insured gives rise to coverage under both INSURING AGREEMENT A and INSURING AGREEMENT B, the Insurer's maximum liability will not exceed the largest single available limit of liability under either INSURING AGREEMENT.

(B)  **Related Claims Deemed Single Claim:**

All Related Claims, whenever made, shall be deemed to be a single Claim, regardless of:

(1)  the number of Related Claims;

(2)  the number or identity of claimants;

(3)  the number or identity of Insureds involved or against whom Related Claims have been or could be made;

(4)  whether the Related Claims are asserted in a class action or otherwise; and

(5)  the number and timing of the Related Claims, even if the Related Claims comprising such single Claim were made in more than one Policy Period.

All Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made, or when the earliest of such Related Claims is treated as having been made in accordance with GENERAL CONDITION (C)(1)(b) below, whichever is earlier.

(C)  **Reporting of Claims, Eligible Regulatory Proceedings, Occurrences and Circumstances:**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(1)    With respect to the coverage afforded under INSURING AGREEMENTS (A), (B) and (C), as a condition precedent to any right to payment of the Insured under this Policy, the following will apply

     (a)    If, during the Policy Period or any Extended Reporting Period, any Claim is first made against any Insured, as a condition precedent to its right to any coverage under this Policy, the Insured shall give the Insurer written notice of such Claim as soon as practicable thereafter, but in no event later than:

         (i)    sixty (60) days after the Expiration Date or earlier cancellation date of this Policy except that if the Insured does not renew or cancels coverage under the Policy, notice must be given no later than the Policy Expiration date or cancellation date; or

         (ii)    the expiration of any Extended Reporting Period.

       Timely and sufficient notice by one Insured of a Claim shall be deemed timely and sufficient notice for all Insureds involved in the Claim. Such notice shall give full particulars of the Claim, including, but not limited to, a description of the Claim; the identity of the Resident, all potential claimants, the health care provider(s) and any Insureds involved; a description of the injury or damages alleged in the Claim; and information on the time, place and nature of the Wrongful Ac(s) or Occurrence(s) underlying the Claim.

     (b)    If during the Policy Period the Insured first becomes aware of any Wrongful Act or Occurrence that may subsequently give rise to a Claim and:

         (i)    gives the Insurer written notice of such Wrongful Act or Occurrence with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

         (ii)    requests coverage under this Policy for any Claim subsequently arising from such Wrongful Act or Occurrence;

       then any Claim not otherwise excluded by this Policy subsequently made against the Insured arising out of such Wrongful Act or Occurrence shall be treated as if it had been first made during the Policy Period. Full particulars of the Wrongful Act or Occurrence shall include, but not be limited to, information on the time, place and nature of the Wrongful Act or Occurrence; the identity of the Resident; all potential claimants and the health care provider(s) and any Insureds involved; the manner in which the Insured first became aware of such Wrongful Act or Occurrence; and the reasons the Insured believes the Wrongful Act or Occurrence is likely to result in a Claim.

(2)    With respect to the coverage afforded under INSURING AGREEMENT (G), as a condition precedent to any right to payment of the Insured under this Policy, the following will apply:

     (a)    If, during the Policy Period or any Extended Reporting Period, any Eligible Regulatory Proceeding is first made against any Insured, as a condition precedent to its right to any coverage under this Policy, the Insured shall give the Insurer written notice of such Eligible Regulatory Proceeding as soon as practicable thereafter, but in no event later than:

         (i)    sixty (60) days after the Expiration Date or earlier cancellation date of this Policy except that if the Insured does not renew or cancels coverage under the Policy, notice must be given no later than the Policy Expiration date or cancellation date; or

         (ii)    the expiration of any Extended Reporting Period.

       Timely and sufficient notice by one Insured of an Eligible Regulatory Proceeding shall be deemed timely and sufficient notice for all Insureds involved in the Eligible Regulatory Proceeding. Such notice shall give full particulars of the Eligible Regulatory Proceeding, including, but not limited to, a description of the Eligible Regulatory Proceeding; the identity of all potential claimants and any

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

insureds involved; a description of the damages alleged; and information on the time, place and nature of the **Regulatory Proceeding** underlying the Eligible **Regulatory Proceeding**.

    (b)    If during the **Policy Period** the **Insured** first becomes aware of any **Regulatory Proceeding** that may give rise to an **Eligible Regulatory Proceeding** and:

        (i)    gives the **Insurer** written notice of such **Regulatory Proceeding** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

        (ii)   requests coverage under INSURING AGREEMENT (E) for any **Eligible Regulatory Proceeding** arising from such **Regulatory Proceeding**;

    then any **Eligible Regulatory Proceeding** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Regulatory Proceeding** shall be treated as if it had been first made during the **Policy Period**. Full particulars of the **Regulatory Proceeding** shall include, but not be limited to, information on the time, place and nature of the **Regulatory Proceeding**; the identity of all potential claimants and any **Insureds** involved; the manner in which the **Insured** first became aware of such **Regulatory Proceeding**; and the reasons the **Insured** believes the **Regulatory Proceeding** is likely to result in an **Eligible Regulatory Proceeding**.

    (3)    Notwithstanding anything to the contrary contained in this Policy, if this Policy is a renewal of one or more policies previously issued by the Insurer to the Named **Insured**, and the coverage provided by the Insurer to the **Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the inception Date of this Policy, the reference to the **Policy Period** in sub-clause (b) of clauses (1) and (2) above will be deemed to refer to the period from (i) the inception date of the first policy under which the Insurer began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal, to (ii) the Expiration Date set forth in ITEM 2(b) of the Declarations.

  **(D)**    **Territory:**

    This policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

  **(E)**    **Mergers, Acquisitions or Newly Created Entities:**

    If, during the **Policy Period**, the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any of which events is referred to as a "**Transaction**" in this GENERAL CONDITION (E)), the Insurer will have the option of providing coverage in respect of such entity or subsidiary, and no coverage will be afforded under this Policy for any **Claim** or **Eligible Regulatory Proceeding** in any way involving the entity or subsidiary that is acquired, created, merged or consolidated with, unless:

    (1)    the **Named Insured** gives the Insurer notice of such **Transaction** as soon as possible but in no event later than ninety (90) days after the effective date of the **Transaction**;

    (2)    the **Named Insured** gives the Insurer such information regarding the **Transaction** as the insurer requests; and

    (3)    the **Named Insured** accepts any terms, conditions, exclusions, and limitations and pays any additional premium as the Insurer, at its sole discretion, imposes.

    If the Insurer, at its sole discretion, elects to provide coverage in respect of such entity or subsidiary, this Policy

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

shall not apply to, and the Insurer will not pay any **Loss** or **Defense Expenses** for, any **Eligible Regulatory Proceeding**, or any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act**, happening before:

    (a)   the effective date of the **Transaction**; or

    (b)   the effective date of coverage under this **Policy** for such entity or subsidiary as set forth in an
     ·    endorsement to be issued to extend coverage to such entity or subsidiary, whichever is later.

For purposes of this GENERAL CONDITION (E), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

(F)    **Sales or Dissolution of Insured Entities; Cessation of Business:**

If, during the **Policy Period**:

(1)    the **Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such
    that the **Named Insured** is not the surviving entity; or

(2)    any person, entity, or affiliated group of persons or entities obtains:

    (a)   ownership or possession of fifty percent (50%) of the issued and outstanding capital stock of the
       **Named Insured**, or;

    (b)   the right to elect or appoint more than fifty percent (50%) of the **Named Insured's** directors or
       trustees; or

    (c)   if the **Named Insured** ceases to do business for any reason;

(any of which events is referred to as a "Transaction" in this GENERAL CONDITION (F) coverage under this **Policy** shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this **Policy** shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such **Transaction**. This **Policy** will not apply to, and the Insurer will not pay any **Loss** or **Defense Expenses** for, any **Eligible Regulatory Proceeding**, or any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act**, happening on or after the effective date of such **Transaction**.

(G)    **Extended Reporting Period:**

(1)    If this **Policy** is terminated by any party for any reason other than misrepresentation, fraud or nonpayment
    of premium, the **First Named Insured** shall have the right to purchase an **Extended Reporting Period**. In
    order to purchase the **Extended Reporting Period**, the **First Named Insured**, within thirty (30) days of the
    earlier of the effective date of termination or the date of any conversion of coverage under GENERAL
    CONDITION (F)(2), must (i) provide written notice by certified mail to the Insurer requesting the **Extended
    Reporting Period**, and (ii) pay any additional premium required by the Insurer promptly when due, together
    with any earned but unpaid premium which may be due under the terminated policy.  The additional
    premium shall be deemed fully earned upon inception of the **Extended Reporting Period**.

(2)    The **Extended Reporting Period** will apply only with respect to any **Wrongful Act** or **Occurrence** committed,
    or **Regulatory Proceeding** happening, before the effective date of such termination or the date of any
    conversion of coverage under GENERAL CONDITION (F)(2), whichever is earlier.  The **Extended Reporting
    Period** will not apply to:

    (a)   any **Claim** for **Professional Services** rendered before the **Retroactive Date** or after the termination
       date of this **Policy**;

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

    (b)   any **Claim** or proceedings pending as of the termination date of this Policy;

    (c)   any paid **Claim**;

    (d)   any **Wrongful Act, Occurrence** or **Regulatory Proceeding** that is covered under any subsequent insurance purchased by the **Insureds** or that would be covered but for exhaustion of the limit of liability applicable to such **Wrongful Act, Occurrence** or **Regulatory Proceeding** under such insurance;

    (e)   any **Administration** of the **Insured's Employee Benefits Program** rendered before the **Retroactive Date** or after termination of this Policy; or

    (f)   any **Wrongful Act or Occurrence** that happened before the **Retroactive Date** of this Policy.

    (3)   If an **Extended Reporting Period** is purchased in accordance with clause (1) above, any **Claim** made during such **Extended Reporting Period** shall be deemed to have been made during the **Policy Period**. The **Insurer's Limit of Liability** in respect of **Claims** made during the **Extended Reporting Period** shall be part of, and not in addition to, the **Insurer's Limit of Liability** for all **Claims** made during the **Policy Period**. The **Extended Reporting Period** will not be deemed to extend the **Policy Period** or change the scope of coverage provided by this Policy.

  **(H)**   **Cancellation; Non-Renewal:**

    (1)   The **Insurer** may not cancel this Policy, except for non-payment of premium, in which case ten (10) days written notice shall be given.

    (2)   The **First Named Insured** may cancel this Policy by mailing the **Insurer** written notice stating when, not later than the **Expiration Date** set forth in ITEM 2(b) of the **Declarations**; such cancellation will be effective. In such event, except as set forth in GENERAL CONDITION (L), the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

    (3)   The **Insurer** will not be required to renew this Policy upon its expiration.

  **(I)**   **Assistance and Cooperation:**

    In the event of a **Claim**, the **Insured** shall provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests. At the **Insurer's** request, the **Insured** shall assist in investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; and the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

  **(J)**   **Subrogation:**

    In the event of any payment hereunder, the **Insurer** shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the **Insurer** effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the **Insurer's** position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (J) shall survive the expiration or termination of the Policy.

  **(K)**   **Other Insurance and Risk Transfer Arrangements:**

    Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance policy or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any of the **Named Insured's** medical staff, **Employees, Volunteers** or **Insured Medical**

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

Practitioners, or other alternative arrangements which apply to the Loss or Defense Expenses shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to Loss or Defense Expenses that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the Limit of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Insurer pay more than the Limit of Liability set forth in ITEM 4 of the Declarations.

**(L)     Exhaustion:**

If the Insurer's Limit of Liability is exhausted by the payment of Loss, the premium will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind or nature whatsoever under this Policy.

**(M)     Authorization and Notices:**

The First Named Insured will act on behalf of all Insureds with respect to the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Insurer; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Discovery Period.

**(N)     Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

**(O)     Representation; Incorporation of Application; Entire Agreement:**

The Insureds represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)     this Policy is issued and continued in force by the Insurer in reliance upon the truth of such representation;

(2)     those particulars and statements are the basis of this Policy; and

(3)     the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any Insured shall be imputed to any other Insured, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any Insured who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

**(P)     No Action against Insurer:**

(1)     No action shall be taken against the Insurer by any Insured unless, as conditions precedent thereto, the Insured has fully complied with all of the terms of this Policy and the amount of the Insured's obligation to pay has been finally determined either by judgment against the Insured after adjudicatory proceedings or by written agreement of the Insured, the Claimant and the Insurer.

(2)     No individual or entity shall have any right under this Policy to join the Insurer as a party to any Claim to determine the liability of any Insured; nor shall the Insurer be impleaded by an Insured or his, her, or its legal representative in any such Claim.

**(Q)     Notice:**

LTC.COV.025 (4.17 ed.)                                                                                      Page: 23 of 25

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

(1) Notice to any Insured shall be sent to the First Named Insured at the address designated in ITEM 1 of the Declarations.

(2) Notice to the Insurer shall be sent to the address designated in ITEM 6 of the Declarations.

(R) **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or change in any part of this Policy or prevent or estop the Insurer from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

(S) **Insolvency of Insured:**

The Insurer will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any Insured or his/her/its estate.

(T) **Inspections and Surveys:**

The Insurer or its duly authorized agent has the right but is not obliged to:

(1) make inspections and surveys of the Named Insured's premises and operations at any time;

(2) provide the Insured with reports on the conditions found;

(3) recommend changes;

(4) conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Insurer does not:

(a) make safety inspections;

(b) undertake to perform the duty of any entity to provide for the health or safety of workers or the public; nor

(c) warrant that conditions:

(i) are safe or healthy; or

(ii) comply with laws, regulations or codes.

(U) **Examination of Books and Records:**

The Insurer may examine and audit the books and records of the Insured as they relate to this Policy.

(V) **Service of Suit:**

The Insurer hereby designates the Director of the Department of Insurance in the state in which this Policy is issued, and his/her successor(s) in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured arising under or out of this Policy.

(W) **Assignment:**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM   INDEX NO. 602409/2025

NYSCEF DOC. NO. 2   RECEIVED NYSCEF: 01/31/2025

No assignment of interest under this Policy shall bind the Insurer without its written consent issued as an endorsement to form a part of this Policy.

(X)   **Entire Agreement:**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the Insurer or any of its agents relating to this insurance.

(Y)   **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof the Insurer has caused this Policy to be executed by its authorized officers.**

Ironshore Specialty Insurance Company by:

**Secretary**                                **President**

LTC.COV.025 (4.17 ed.)                              Page: 25 of 25

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025



# IRONSHORE.
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 1**

**Policy Number:** HC7PACIKF1002                  **Effective Date of Endorsement: April 22, 2023**
**Insured Name:** Jeffrey H and The Estate of Eleanor White

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SANCTION LIMITATION AND EXCLUSION CLAUSE

No Insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that Insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025



# IRONSHORE.
### A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 2**

**Policy Number:** HC7PACIKF1002
**Insured Name:** Jeffrey H and The Estate of Eleanor White

**Effective Date of Endorsement:** April 22, 2023

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NEW YORK LIABILITY STATE AMENDATORY ENDORSEMENT

The failure to give notice as prescribed by this Policy will not invalidate a Claim made by the insured, an insured Person, or any other claimant, unless the late notice has prejudiced the insurer. With respect to a personal injury or wrongful death claim, if the insurer disclaims liability or denies coverage based on a failure to provide timely notice, then the injured person or other claimant may maintain an action directly against the insurer, on the sole question of late notice, unless the insured or the insurer, within sixty (60) days of the disclaimer, initiates an action to declare the rights of the parties under the policy, and names the injured person or other claimant as a party to the action.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2



## IRONSHORE
### A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 3**

**Policy Number:** HC7PACIKF1002
**Insured Name:** Jeffrey H and The Estate of Eleanor White

**Effective Date of Endorsement:** April 22, 2023

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SCHEDULE OF LOCATIONS WITH APPLICABLE RETROACTIVE DATES

In consideration of the premium charged, in addition to the Principal Address shown in ITEM 1 of the Declarations, the coverage afforded under this Policy shall apply to each of the following location(s), but solely with respect to Wrongful Acts committed or allegedly committed, or Occurrences happening, on or after the retroactive date set forth opposite the name of each such location:

**Location(s)**
- **White Oaks Rehabilitation and Nursing Center 8565 Jericho Turnpike Woodbury, NY 11797**

**Retroactive Date:**
4/22/07

All other terms, conditions and limitations of this Policy shall remain unchanged.

LTC.P.009 (03/09 Ed.)

**Page 1 of 1**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

# IRONSHORE.
## A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 4**

Policy Number: HC7PACIKF1002
Insured Name: Jeffrey H and The Estate of Eleanor White

Effective Date of Endorsement: April 22, 2023

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND DEFINITION OF "NAMED INSURED" TO INCLUDE ADDITIONAL ENTITIES

In consideration of the premium charged, the term "Named Insured," as defined in Section II DEFINITIONS of the Policy, is amended to include each of the following entities, but solely with respect to Wrongful Acts committed or allegedly committed, or Occurrences happening, on or after the Retroactive Date:

Additional Named Insured(s)

- 8565 Jericho Turnpike Realty LLC

All other terms, conditions and limitations of this Policy shall remain unchanged.

LTC.P.012 (03/09 Ed.)

Page 1 of 1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 5**

**Policy Number: HC7PACIKF1002**
**Insured Name: Jeffrey H and The Estate of Eleanor White**

**Effective Date of Endorsement: April 22, 2023**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MINIMUM EARNED PREMIUM ENDORSEMENT

In consideration of the premium charged, it is expressly understood and agreed that twenty-five percent (25%) of the premium amount set forth in ITEM 5 of the Declarations shall be deemed fully earned on and as of the Inception Date set forth in ITEM 2 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025


# IRONSHORE.
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

Endorsement # 6

Policy Number: HC7PACIKF1002
Insured Name: Jeffrey H and The Estate of Eleanor White

Effective Date of Endorsement: April 22, 2023

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PRE-APPROVED COUNSEL ENDORSEMENT

In consideration of the premium charged, notwithstanding anything to the contrary in this Policy, the Insured will be permitted to use Keith Kaplan — KBR Law to represent them, at the rates previously negotiated with the Insurer, with respect to Claims under this Policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

LTC.END.207 (7.16 ed.)

Page: 1 of 1

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



**IRONSHORE**
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

Endorsement # 7

**Policy Number:** HC7PACIKF1002
**Insured Name:** Jeffrey H and The Estate of Eleanor White

**Effective Date of Endorsement:** April 22, 2023

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CLASS ACTION EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy, and the Insurer will not pay any Loss or Defense Expenses, for any Class Action Claim. For purposes hereof, "Class Action Claim" means any Claim brought or filed originally as, or amended at any time seeking certification as, a class action whether or not such action is actually certified; or brought by or on behalf of any association or group, including but not limited to, societies, trade groups, professional groups, consumer advocates or advocacy groups, whether such Claim is brought in the name of such association or group or by such association or group on behalf of one or more constituent individual(s) or entity(ies).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

LTC.END.237 (4.17 ed.)

Page: 1 of 1

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



**IRONSHORE SPECIALTY INSURANCE COMPANY**
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 8**

Policy Number: HC7PACIKF1002
Insured Name: Jeffrey H and The Estate of Eleanor White

Effective Date of Endorsement: April 22, 2023

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DISINFECTION EVENT EXPENSE REIMBURSEMENT COVERAGE

In consideration of the premium charged,

1.  In the event that reasonable **Disinfection Expense** (as defined below) actually paid by the Named Insured during the **Policy Period** in connection with a **Disinfection Event** occurring during the **Policy Period** are not covered for any reason under any other policy or policies of insurance issued to the Named Insured, the Insurer shall reimburse the Named Insured for such **Disinfection Expense**, subject to the limits of liability set forth in paragraph (2) below and self-insured retention set forth in paragraph (3) below, and upon satisfactory proof of payment by the Named Insured.

2.  The Insurer's maximum aggregate limit for all **Disinfection Expense** resulting from all **Disinfection Events** reimbursed under paragraph (1) above shall be $25,000, which amount is in addition to, and not part of, the Limits of Liability set forth in ITEM 4 of the Declarations. Payment of such maximum aggregate limit of liability shall terminate the Insurer's obligation to reimburse any further **Disinfection Expense** under paragraph (1) above.

3.  The Insurer's obligation to reimburse **Disinfection Expense** under paragraph (1) above shall be excess of a self-insured retention of $5,000 per **Disinfection Event**. The Named Insured shall be responsible for payment in full of such self-insured retention. The self-insured retention shall apply to each **Disinfection Event**, and shall be eroded (or exhausted) by the Named Insured's payment of **Disinfection Expense**.

4.  For purposes of this endorsement, the following terms shall have the meanings ascribed to them below:

    (a)  **"Disinfection Event"** means any case or series of cases of the MRSA virus, Legionella, or other facility-borne infectious virus, bacteria or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity.

    (b)  **"Disinfection Expense"** means reasonable fees and costs incurred by the Named Insured to investigate, remove, dispose of, abate, contain, treat, neutralize, monitor or test any contaminated water, surface or other media in or on the Named Insured's facility after any **Disinfection Event**. Disinfection Expense includes costs (a) to engage third party providers of cleaning/disinfection services; (b) to notify patients/residents, visitors or other potentially affected persons; and (c) incurred in the management of public relations with respect to such **Disinfection Event**. Disinfection Expense does not include any remuneration, salaries, overhead, fees, loss of

LTC.END.242 (4.17 ed.)

Page 1 of 2

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

earning reimbursement or benefit expenses of the Named Insured, or cost of cleaning/disinfecting supplies or products.

5.  The Insurer shall not be liable under this endorsement for any Disinfection Expense for which the Named Insured has coverage under any insurance policy other than this Policy, regardless of whether such policy is stated to be primary, contributory, excess, contingent, or otherwise.

6.  Neither EXCLUSION B(10) nor EXCLUSION D(12) shall be construed to limit or negate the coverage afforded under this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

## 🔥 IRONSHORE.
### A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 9**

**Policy Number:** HC7PACIKF1002                          **Effective Date of Endorsement:** April 22, 2023
**Insured Name:** Jeffrey H and The Estate of Eleanor White

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CYBER LIABILITY EXCLUSION – LONG TERM CARE

In consideration of the premium charged:

I.      Section III. Exclusions, subsection (D)(9) is deleted.

II.     The following is added to **Section III. Exclusions:**

(E)     **Exclusions Applicable to INSURING AGREEMENTS (A), (B), (C), (D), (F), (G), (H) and (I):**

In addition to EXCLUSIONS listed under Section III. Exclusions (A), (B), (C), and (D), no coverage will be available under INSURING AGREEMENTS (A), (B), (C), (D), (F), (G), (H), and (I), and the insurer will not pay any **Loss, Defense Expenses, Evacuation Expense, or Resident Loss of Property** for any **Claim, Evacuation,** or **Eligible Regulatory Proceeding** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Cyber Liability**

(a)     collection, release, disclosure, loss, storage or possession of, or access to, any person's or organization's confidential, personal or identifying information, including but not limited to patient's lists, financial information, credit card information, health or medical information or any other type of nonpublic information, by any party;

(b)     violation of any federal, state or foreign law or company policy that governs the protection, storing or use of information, including but not limited to the General Data Protection Regulation ("GDPR") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and any amendments thereto, whether the **Claim** is made by or on behalf of a private individual, entity or government agency; or

(c)     partial or total: loss of; loss of use of; damage to; corruption of; obstruction or inability to access; or inability to manipulate **Electronic Data** (as defined below), including but not limited to **Electronic Data** impacted by a denial of service attack, malicious computer code, extortion or unauthorized access.

For purposes of this exclusion, the term **Electronic Data** means any information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are or may be used with electronically controlled equipment or other

LTC.END.317 (11.19 ed.)                                                          Page 1 of 2

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

electronic backup facilities, and data transmission or storage by means of the internet. Electronic Data is not tangible property.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

LTC.END.317 (11.19 ed.)                                                                 Page 2 of 2

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

**IRONSHORE.**
A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 10**

**Policy Number: HC7PACIKF1002**
**Insured Name: Jeffrey H and The Estate of Eleanor White**

**Effective Date of Endorsement: April 22, 2023**

#### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## .BLANKET ADDITIONAL INSURED – GL, PRIMARY AND NON-CONTRIBUTORY

In consideration of the premium charged,

1. With respect solely to the coverage afforded under INSURING AGREEMENT (B) of this Policy, the term "**Insured,**" as defined in the Policy, shall be deemed to include:

   a. Any person or organization with whom/which the Named Insured has agreed in writing in a contract or agreement to add such person or organization as an additional insured on this Policy; and

   b. Any person or entity from whom the Named Insured leases real property, personal property (including equipment), and land.

For purposes of this endorsement, each such person or organization is referred to as an "**Additional Insured.**"

2. It is understood and agreed that each Additional Insured is being afforded coverage under this Policy for any liability incurred *solely* as a result of the acts, errors or omissions of the original Insured. No coverage will be available under this Policy for any Claim based on or arising out of any actual or alleged independent or direct liability or any Additional Insured.

3. The coverage afforded any Additional Insured under this endorsement shall be primary to any other Insurance or self-insurance maintained by such Additional Insured, and without contribution from any such other Insurance or self-Insurance within the applicable Limit of Liability of the Policy.

4. Provided that the Insured provides the Insurer with the identity of the Additional Insured(s), the Insurer will provide such Additional Insured(s) with at least ten (10) days' written notice of cancellation or non-renewal of this Policy if such cancellation or non-renewal is for non-payment of premium, or sixty (60) days' written notice of cancellation or non-renewal if such cancellation or non-renewal is for any other reason.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

LTC.END.327 (3.20 ed.)                                                           Page 1 of 1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025



**IRONSHORE.**
A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 11**

Policy Number: HC7PACIKF1002                                    Effective Date of Endorsement: April 22, 2023
Insured Name: Jeffrey H and The Estate of Eleanor White

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND CLAIMS MADE GENERAL LIABILITY PROVISIONS

In consideration of the premium charged,

1. Clause (1) of Section I INSURING AGREEMENT (B) of this Policy is deleted and replaced with the following:

    (1) The Insurer will pay on behalf of the Insured any **Loss** that the Insured is legally obligated to pay as a result of any covered **Claim** alleging **Bodily Injury, Property Damage, Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** that takes place on or after the **Retroactive Date**, but before the expiration of the **Policy Period**, provided that the **Claim** is first made against the Insured during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

2. The definition of "**Claim**" set forth in Section II DEFINITIONS of the Policy, is deleted and replaced with the following:

    "**Claim**" means any written notice received by an **Insured** that a person or entity intends to hold an **Insured** responsible for an **Occurrence** that takes place, or for a **Wrongful Act** committed or allegedly committed, on or after the applicable **Retroactive Date** but before the expiration of the **Policy Period**. **Claim** does not include a **Regulatory Proceeding**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

LTC.END.347 (11.20 ed.)                                                                                                              Page: 1 of 1

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025



**IRONSHORE.**
A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 12**

Policy Number: HC7PACIKF1002
Insured Name: Jeffrey H and The Estate of Eleanor White

Effective Date of Endorsement: April 22, 2023

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PANDEMIC/EPIDEMIC/SCHEDULED INFECTIOUS DISEASE EXCLUSION

In consideration of the premium charged, it is expressly understood and agreed that:

1. No coverage will be available under this Policy for any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Widespread Illness**, including, but not limited to, Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   a. failure to prevent the transmission of any **Infectious Disease** that is a **Widespread Illness** by an **Insured**, an independent contractor who is providing services to, for, or on behalf of an **Insured**, a **Resident** or a visitor or anyone else for whom the **Insured** is alleged to be or found to be responsible, including, but not limited to, the failure to comply with or to implement any request, demand, order or applicable guidance of any local, state, or federal governmental authority or specialized agency created by treaty or charter;

   b. failure to diagnose, monitor or treat, or improper treatment of, any **Infectious Disease** that is a **Widespread Illness**;

   c. any act, error or omission in the furnishing, dispensing, distribution, administration or use of any vaccine or other preventative measure for an **Infectious Disease** that is a **Widespread Illness**;

   d. violation of **Rights of Residents** or other statutory violations in relation to or resulting from any **Widespread Illness**;

   e. rationing or withholding of **Professional Services**, due to a lack, shortage, limited availability, or following government directives; or unavailability of, or an inability to procure or otherwise obtain or retain any medications, personnel, equipment or supplies actually or allegedly occurring in relation to or resulting from any **Widespread Illness**;

   f. failure to report to any local, state, or federal government authority or warn any person of an **Infectious Disease** that is a **Widespread Illness**;

   g. failure to test, monitor, clean, contain, sterilize, neutralize, remediate, dispose, respond to, or assess the effects of an **Infectious Disease** that is a **Widespread Illness**;

   h. use, hiring, retention, or supervision of medical providers actually or allegedly lacking any license, credential, privileges, or registration in violation of the regulations or other laws in force at the time of the alleged act, error or omission, or occurrence in relation to any **Widespread Illness**;

LTC.END.356 (4.21 ed.)

Page 1 of 2

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

  I. vicarious liability, other derivative liability, or joint and several liability of any Insured for or with, any other Insured, co-defendant, entity, business, manufacturer, medical care provider, person, or governmental entity that has been granted, enjoys, claims or asserts immunity; or

  J. acts or omissions resulting in the loss of immunity.

2. **"Widespread Illness"** means any Epidemic, Pandemic, or Scheduled Infectious Disease.

**"Epidemic"** means a widespread occurrence of an Infectious Disease that a Public Health Authority has declared to be, or assessed or characterized as, an epidemic in any public statement.

**"Immunity"** means immunity from suit or liability, limitation on liability, or other legal protection against civil or criminal liability afforded to any person or entity pursuant to any statute, regulation, ordinance, executive order, declaration by any federal or state agency, or other applicable law with respect to any Claim arising from the provision of Professional Services in connection with or in response to any Widespread Illness.

**"Pandemic"** means an Epidemic that any Public Health Authority has declared to be, or assessed or characterized as, a pandemic in any public statement.

**"Public Health Authority"** means any state, federal or local government within the United States of America, including the Center for Disease Control, or any international body, agency or authority, including the World Health Organization, that is tasked with overseeing the public health or is authorized to declare, assess or characterize circumstances as a Pandemic, Epidemic or widespread occurrence of Infectious Disease.

**"Infectious Disease"** means an illness or disease caused by the infection, presence and growth of pathogenic biologic agents in an individual human or other animal host, including but not limited to any bacteria, virus, mold, mildew, fungi, parasite or other vector and which biologic agents or its toxins are directly or indirectly transmitted to infected individuals from an infectious person, consuming contaminated foods or beverages, contact with contaminated body fluids, contact with contaminated inanimate objects, inhalation, being bitten by an infected animal, insect or tick, or other means. Infectious Disease includes all Scheduled Infectious Diseases.

**"Scheduled Infectious Disease"** means:

  a. the disease known as Coronavirus disease 19 or COVID-19, or any other condition, disease or sickness caused by the virus responsible for COVID-19 or by any mutation of that virus.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.**

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



**IRONSHORE SPECIALTY INSURANCE COMPANY**
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

Endorsement # 13

**Policy Number:** HC7PACIKF1002
**Insured Name:** Jeffrey H and The Estate of Eleanor White

**Effective Date of Endorsement:** April 22, 2023

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the above captioned policy.

**A. Cap on Certified Act of Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

TRIA-E002-0315

Page 1 of 1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025



**IRONSHORE**
A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

Endorsement # 14

Policy Number: HC7PACIKF1002
Insured Name: Jeffrey H and The Estate of Eleanor White

Effective Date of Endorsement: April 22, 2023

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DISCLOSURE – TERRORISM RISK INSURANCE ACT

### THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act. If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses from certified acts of terrorism exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for the Federal Share of losses paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger".

Beginning calendar year 2020, the Federal Share is 80% and Program Trigger is $200,000,000.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

TRIA-N004-0420

Page 1 of 1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



## IRONSHORE.
### A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 15**

Policy Number: HC7PACIKF1002
Insured Name: Jeffrey H and The Estate of Eleanor White

Effective Date of Endorsement: April 22, 2023

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SERVICE OF SUIT CLAUSE
## (METHOD OF SUIT IN STATE OF NEW YORK)

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS IN THIS POLICY

The Ironshore Specialty Insurance Co. hereby appoints Corporation Service Company, 80 State Street, Albany, NY 12207-2543 as the true and lawful attorney of Ironshore Specialty Insurance Co. in and for the State of New York upon whom all lawful process may be served in any action, "suit" or proceeding instituted in the State of New York by or on behalf of any insured or beneficiary against the Ironshore Specialty Insurance Co. arising out of the insurance policy to which this provision is attached.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

SC-11 (11/18)

Page 1 of 1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

### Liberty Mutual Group California Privacy Notice
Commercial Lines (excluding Workers' Compensation)
(Effective January 1, 2023)

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers. This Privacy Notice explains how we gather, use, and share your data. This Privacy Notice applies to you if you are a **Liberty Mutual commercial line** insured or are a commercial line claimant residing in California. It does not apply to covered employees or claimants under Workers' Compensation policies. If this notice does not apply to you, go to liberimutual.com/privacy to review the applicable Liberty Mutual privacy notice.

**What Personal Data Do We Collect?**

The types of personal data we gather and share depend on both the product and your relationship to us. For example, we may gather different data if you are a claimant reporting an injury than if you want a quote for commercial property insurance. The data we gather can include your Social Security Number, income, transaction data such as account balances and payment history, and data from consumer reports. It may also include data gathered in connection with our provision of insurance services, when you apply for such services, or resulting from other contacts with you. It may also include:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;
- **Personal data**, such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial data, precise geolocation, medical data, or health insurance data;
- **Protected classification characteristics described in California Civil Code § 1798.80(e)**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;
- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories and tendencies;
- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;
- **Professional or employment related information**, including current or past job history Inferences drawn from other personal information, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;
- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records, and loss history information, health data, or criminal convictions;
- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data; and
- **Sensitive Data** as defined under the California Privacy Rights Act when used to infer characteristics of an individual.

For information about the types of personal data we have collected in the past twelve (12) months, please go to lmi.co/caprivacynotices and click on the link for the California Privacy Policy (Consumers).

1

Version 3.0 (last updated November 2022)

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

### How do you gather my data?

| We gather your personal data directly from you. For example, you provide us with data when you: | We also gather your personal data from other people. For example: |
|---|---|
| ▪ ask about or buy insurance, or file a claim | ▪ your insurance agent or broker |
| ▪ pay your policy | ▪ your employer, association or business (if you are insured through them) |
| ▪ visit our websites, call us, or visit our office | ▪ our affiliates or other insurance companies about your transactions with them |
| | ▪ consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value and condition of your property |
| | ▪ other public directories and sources |
| | third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government agencies, open electoral register, or in the event of a claim, third parties including other parties to the claim witnesses, experts, loss adjusters and claim handlers |
| | ▪ other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

Organizations that share data with us may keep it and disclose it to others as permitted by law. For data about how we have gathered personal data in the past twelve months, please go to lmi.co/caprivacynotices and click on the link for the California Privacy Policy (Consumers).

### How Do We Use Your Personal Data?

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice. We may use your data and the data of our former customers for our business and other compatible purposes. Our business purposes include, for example:

| Business Purpose | Data Categories | Do we share or sell your information as defined by CPRA |
|---|---|---|
| **Market, sell and provide insurance.** This includes, for example: <br> • calculating your premium; <br> • determining your eligibility for a quote; <br> • confirming your identity and servicing your policy; | ▪ Identifiers <br> ▪ Personal Information <br> ▪ Protected Classification Characteristics <br> ▪ Commercial Information <br> ▪ Internet or other similar network activity <br> ▪ Professional or employment related information. | ▪ No |

2

Version 3.0 (last updated November 2022)

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

**FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM**

NYSCEF DOC. NO. 2

| | | |
|---|---|---|
| | <ul><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li><li>Sensitive Data</li></ul> | |
| **Manage your claim.** This includes, for example: <ul><li>managing your claim, if any;</li><li>conducting claims investigations;</li><li>conducting medical examinations;</li><li>conducting inspections, appraisals;</li><li>providing roadside assistance;</li><li>providing rental car replacement or repairs;</li></ul> | <ul><li>Identifiers</li><li>Personal Information</li><li>Protected Classification Characteristics</li><li>Commercial Information</li><li>Internet or other similar network activity</li><li>Professional or employment related information</li><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li></ul> | • No. |
| **Day to Day Business and Insurance Operations.** This includes, for example: <ul><li>creating, maintaining, customizing, and securing accounts;</li><li>supporting day-to-day business and insurance related functions;</li><li>doing internal research for technology and development;</li><li>marketing, advertising and creating products and services;</li><li>conducting audits related to a current contact with a consumer and other transactions;</li><li>as described at or before the point of gathering personal data or with your authorization;</li></ul> | <ul><li>Identifiers</li><li>Personal Information</li><li>Protected Classification Characteristics</li><li>Commercial Information</li><li>Internet or other similar network activity</li><li>Professional or employment related information</li><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li></ul> | • No. |
| **Security and Fraud Detection.** This includes, for example: <ul><li>detecting security issues;</li><li>protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities;</li><li>managing risk and securing our systems, assets, infrastructure, and premises;</li><li>help to ensure the safety and security of Liberty staff, assets, and resources, which may include physical and virtual</li></ul> | <ul><li>Identifiers</li><li>Personal Information</li><li>Protected Classification Characteristics</li><li>Commercial Information</li><li>Internet or other similar network activity</li><li>Professional or employment related information</li><li>Inferences drawn from other personal information</li><li>Risk data</li><li>Claims data</li></ul> | • No. |

3

Version 3.0 (last updated November 2022)

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

| | | |
|---|---|---|
| access controls and access rights management; <br> ■ supervisory controls and other monitoring and reviews, as permitted by law; and emergency and business continuity management; | | |
| **Regulatory and Legal Requirements.** This includes for example: <br> ■ controls and access rights management; <br> ■ to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Liberty's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty is among the assets transferred; <br> ■ exercising and defending our legal rights and positions; <br> ■ to meet Liberty contract obligations; <br> ■ to respond to law enforcement requests as required by applicable law, court order, or governmental regulations; <br> ■ as otherwise permitted by law; | ■ Identifiers <br> ■ Personal Information <br> ■ Protected Classification Characteristics <br> ■ Commercial Information <br> ■ Internet or other similar network activity <br> ■ Professional or employment related information <br> ■ Inferences drawn from other personal information <br> ■ Risk data <br> ■ Claims data | No. |
| **Improve Your Customer Experience and Our Products.** This includes, for example: <br> ■ improve your customer experience, our products, and service; <br> ■ to provide support, personalize, and develop our website, products, and services; <br> ■ create and offer new products and services; | ■ Identifiers <br> ■ Personal Information <br> ■ Commercial Information <br> ■ Internet or other similar network activity <br> ■ Professional or employment related information <br> ■ Inferences drawn from other personal information <br> ■ Risk data <br> ■ Claims data | No. |
| **Analytics to identify, understand, and manage our risks and products.** This includes, for example: <br> ■ conducting analytics to better identify, understand, and manage risk and our products; | ■ Identifiers <br> ■ Personal Information <br> ■ Protected Classification Characteristics <br> ■ Commercial Information <br> ■ Internet or other similar network activity | No. |

Version 3.0 (last updated November 2022)

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

| | | |
|---|---|---|
| | ▪ Professional or employment related information<br>▪ Inferences drawn from other personal information;<br>▪ Risk data<br>▪ Claims data<br>▪ Sensitive Data | |
| **Customer service and technical support.** This includes, for example:<br>• answer questions and provide notifications;<br>• provide customer and technical support. | ▪ Identifiers<br>▪ Personal Information<br>▪ Commercial Information<br>▪ Internet or other similar network activity<br>▪ Professional or employment related information<br>▪ Inferences drawn from other personal information<br>▪ Risk data<br>▪ Claims data | No. |
| **Cross-Context Behavioral Advertising** | ▪ Identifiers<br>▪ IP address<br>▪ Internet or other similar network activity | ▪ We share this information with service providers such as search engines and social media platforms |

Liberty Mutual will not collect additional categories of personal information or use the personal information we collected for materially unrelated, or incompatible purposes without updating our notice.

**Do We Disclose Your Personal Data?**

Liberty Mutual does not sell your personal data as defined by California law.

Liberty Mutual shares your personal data as disclosed above. The California privacy law defines sharing as "communicating orally, in writing, or by electronic or other means, a consumer's personal information . . . to a third party for cross-context behavioral advertising, whether or not for monetary or other valuable consideration." This occurs when you visit the Liberty Mutual website. Cookies or pixels are deployed that then allow us to show you targeted advertisements when you visit other websites or social media platforms. You have the right to opt-out of this type of sharing and you may learn more about those rights at lmi.co/caprivacychoices.

This type of sharing is different from disclosing personal information to other entities to perform a service related to providing insurance or processing your claim. How we disclose data to these types of entities is set forth below.

Liberty Mutual may disclose personal data with affiliated and non-affiliated third parties, including:

- Liberty Mutual affiliates;
- Service Providers (such as auto repair facilities, towing companies, property inspectors, and independent adjusters);
- Insurance support organizations;
- Brokers and agents;
- Public entities (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Consumer reporting agencies;
- Advisors including law firms, accountants, auditors, and tax advisors;
- Insurers, re-insurers, policy holders, and claimants;
- Group policyholders (for reporting claims data or an audit);
- A person, organization, affiliates or service providers conducting actuarial or research studies; and
- As permitted by law.

We may also disclose data with other companies that provide marketing services on our behalf or as part of a joint

5

Version 3.0 (last updated November 2022)

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

marketing agreement for products offered by Liberty Mutual. We will not disclose your personal data with others for their own marketing purposes.

We may also disclose data about our transactions (such as payment history) and experiences (such as claims made) with you to our affiliates.

Liberty Mutual may disclose the following categories of personal data as needed for business purposes:

| | |
|---|---|
| Identifiers | Personal Data |
| Protected Classification Characteristics | Commercial Data |
| Internet or other similar network activity | Professional, employment, and education data |
| Inferences drawn from personal data | Risk Data |
| Claims Data | |

For information about how we have shared personal information in the past twelve (12) months, please go to lmi.co/caprivacynotices and click on the link for the California Privacy Policy (Consumers).

### How Long Does Liberty Mutual Retain Each Category of Personal Data?

We retain your information in accordance with our legal obligations, our records retention policies, or as otherwise permitted by law. For example, we may have a legal obligation to retain information relating to your policies or claims with us. We will delete your data once the legal obligation expires or after the period of time specified in our records retention policies. The period of retention is subject to our review and alteration.

### How to Contact Us:

You can submit requests, seek additional information, or obtain a copy of our Privacy Notice in an alternative format by either:

| | |
|---|---|
| **Calling:** | 800-344-0197 |
| **Email:** | privacy@libertymutual.com |
| **Online:** | www.libertymutualgroup.com/privacy-policy/data-request |
| | lmi.co/caprivacychoices |
| **Postal Address:** | Liberty Mutual Insurance Company |
| | 175 Berkeley St., 6th Floor |
| | Boston, MA 02116 |
| | Attn: Privacy Office |

6

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 3

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

# Exhibit "B"

# EXHIBIT "B"

FILED: NASSAU COUNTY CLERK 01/31/2025 03:04 PM    INDEX NO. 602409/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 09/27/2023

FILED: NASSAU COUNTY CLERK 09/27/2023    INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

NYSCEF DOC. NO. 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
---------------------------------------------------------X

AMELIA McDONNELL, as Proposed Administratrix of
the Estate of WILLIAM McDONNELL, Deceased,

*Plaintiff(s),*

-against-

WHITE OAK REHABILITATION AND NURSING
CENTER,

*Defendant(s),*
---------------------------------------------------------X

Index No.:

Date Purchased:

Plaintiff designates NASSAU
County as the place of trial.

SUMMONS

The basis of venue is
Plaintiff's residence:
602 Breton Way
Glen Cove, New York

Date Filed:

To the above-named Defendants:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiffs' Attorney within twenty (20) days after service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

JURY TRIAL DEMANDED

DATED:    New York, New York
          September 17, 2023

Yours, etc.,

Jeffrey A. Guzman, Esq.
*Krentsel Guzman Herbert, LLP*
Attorneys for Plaintiff
17 Battery Place, Suite #604,
New York, New York 10004
(212) 227-2900

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO.
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
INDEX NO. 500016/2023
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023

Defendant's Address:

WHITE OAK REHABILITATION AND NURSING CENTER
8565 Jericho Turnpike
Woodbury, New York 11797

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 3
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025
INDEX NO. 602409/2025
RECEIVED NYSCEF: 09/27/2023

SUPREME COURT OF THE STATE OF
NEW YORK COUNTY OF NASSAU
-------------------------------------------------------------X

AMELIA MCDONNELL, as Proposed Administratrix
of the Estate of WILLIAM MCDONNELL, Deceased,

                Plaintiff(s),

-against-

WHITE OAK REHABILITATION AND NURSING
CENTER,

                Defendant(s).
-------------------------------------------------------------X

VERIFIED COMPLAINT

Index No.:

Plaintiff(s), by their attorneys, KRENTSEL GUZMAN HERBERT, LLP., complaining of the Defendants, WHITE OAK REHABILITATION AND NURSING CENTER, (collectively "Defendants"), upon information and belief respectfully alleges as follows:

## INTRODUCTION

1.    This action is being commenced due to Defendants' abject and longstanding failure to maintain a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals, and Defendants' failure to adequately care for and protect its elderly and vulnerable residents, which led to the death of the decedent, WILLIAM MCDONNELL, from COVID-19 (known colloquially as the "coronavirus") infection on December 12, 2020.

2.    From May 25, 2018 through April 13, 2022, WHITE OAK REHABILITATION AND NURSING CENTER was cited by government inspectors and regulators 10 times, including for failing to provide and implement an infection prevention and control program.

1

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

INDEX NO. 602409/2025

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 09/27/2023

3.    In addition, prior to the coronavirus emergency in New York, on February 6, 2020, WHITE OAK REHABILITATION AND NURSING CENTER was placed on notice by Centers for Medicare and Medicaid Services that coronavirus infections can rapidly appear and spread, and that it was critical that the nursing home be prepared by planning for infectious and diseases response, including having sufficient personal protective equipment (PPE) available.

4.    However, WHITE OAK REHABILITATION AND NURSING CENTER failed to take proper precautions to help prevent the development of infections prior to and leading up to the COVID-19 pandemic. As a direct and foreseeable consequence of the Defendants' failure, as of February 28, 2023, there was a confirmed COVID-related death count of 38 residents who died inside WHITE OAK REHABILITATION AND NURSING CENTER due to COVID-19 and 14 resident deaths outside of the facility.

5.    The claims against Defendants asserted herein are premised on violation of resident's rights laws pursuant to Public Health Law sec.2801-d, negligence and gross negligence, and wrongful death. Plaintiff also seeks recovery for punitive damages from the Defendants based upon its longstanding grossly negligent and reckless actions in failing to protect residents from harm.

### PARTIES TO THER ACTION:

6.    That at all times hereinafter mentioned, the Plaintiff, AMELIA MCDONNELL, is the wife of the decedent, WILLIAM MCDONNELL, and is resident of the County of Nassau, State of New York.

7.    Plaintiff, AMELIA MCDONNELL, is the Proposed Administratrix of the Estate of

2

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 609046/2023
RECEIVED NYSCEF: 09/27/2023

WILLIAM MCDONNELL representing the interest of the decedent, WILLIAM MCDONNELL, and his Estate, in this action.

8. At all times hereinafter mentioned, the decedent, WILLIAM MCDONNELL, was a resident of the County of Nassau, State of New York

9. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was and still is a domestic corporation duly existing under and by virtue of the laws of the State of New York, having its principal place of business at 8565 Jericho Turnpike, Woodbury, New York.

10. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was and still is a domestic corporation duly existing under and by virtue of the laws of the State of New York, having its principal place of business at 8565 Jericho Turnpike, Woodbury, New York.

11. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was authorized to do business as a nursing home at 8565 Jericho Turnpike, Woodbury, New York.

12. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER, was authorized to do business as an Enhanced Housing Program Facility at 8565 Jericho Turnpike, Woodbury, New York.

13. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER, was authorized to do business as an Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

3

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 3

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 500010/2023
RECEIVED NYSCEF: 09/27/2023

14. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER, was authorized to do business as an Enhanced Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

15. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER, was authorized to do business as a Special Needs Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

16. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owned a nursing home facility at 8565 Jericho Turnpike, Woodbury, New York.

17. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owned an Enhanced Housing Program Facility at 8565 Jericho Turnpike, Woodbury, New York.

18. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owned an Assisted Living Facility at 8565 Jericho Turnpike, Woodbury, New York.

19. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owned an Enhanced Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

20. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owned a Special Needs Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

4

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 3

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM

NYSCEF DOC. NO. 1

INDEX NO. 606437/2023

RECEIVED NYSCEF: 09/27/2023

21. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER operated a nursing home facility at 8565 Jericho Turnpike, Woodbury, New York.

22. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER operated an Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

23. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER operated an Enhanced Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

24. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER operated a Special Needs Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York.

25. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER operated a nursing home facility at 8565 Jericho Turnpike, Woodbury, New York.

26. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER operated a nursing home facility at 8565 Jericho Turnpike, Woodbury, New York.

27. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessor of a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

5

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF FILED NONASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 500736/2025
RECEIVED NYSCEF: 09/27/2023

28. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessor of an Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

29. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessor of an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

30. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessor of a Special Needs Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

31. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessee of a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

32. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessee of an Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

33. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessee of an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

34. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER was the lessee of a Special Needs Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

6

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 1

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM

INDEX NO. 602409/2025
INDEX NO. 500015/2023
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023

35.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER maintained a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

36.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER maintained an Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

37.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER maintained an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

38.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER maintained a Special Needs Assisted Living Residence facility located at 8565 Jericho Turnpike, Woodbury, New York.

39.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER managed a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

40.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER managed an Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

41.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER managed an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

7

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 3

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM

NYSCEF DOC. NO. 1

INDEX NO. 500016/2023

RECEIVED NYSCEF: 09/27/2023

42. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER managed a Special Needs Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

43. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER managed a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

44. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER supervised a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

45. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER supervised an Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

46. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER supervised an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

47. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER supervised a Special Needs Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

48. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER inspected a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

8

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 3

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025
INDEX NO. 500016/2023
RECEIVED NYSCEF: 09/27/2023

49.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER inspected a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

50.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER inspected an Assisted Living Facility located at 8565 Jericho Turnpike, Woodbury, New York.

51.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER inspected an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

52.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER inspected a Special Needs Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

53.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER controlled a nursing home facility located at 8565 Jericho Turnpike, Woodbury, New York.

54.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER controlled an Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

55.   That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER controlled an Enhanced Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

9

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 600816/2023

RECEIVED NYSCEF: 09/27/2023

56. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER controlled a Special Needs Assisted Living Residence located at 8565 Jericho Turnpike, Woodbury, New York.

57. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER conducted business as an adult care facility at 8565 Jericho Turnpike, Woodbury, New York licensed and defined under New York Public Health Law §2801(2).

58. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER conducted business as a nursing home facility at 8565 Jericho Turnpike, Woodbury, New York licensed and defined under New York Public Health Law §2801(2).

59. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER conducted business as an Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York licensed and defined under New York Public Health Law §2801(2).

60. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER conducted business as an Enhanced Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York licensed and defined under New York Public Health Law §2801(2).

61. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER conducted business as a Special Needs Assisted Living Residence at 8565 Jericho Turnpike, Woodbury, New York licensed and defined under New York Public Health Law §2801(2).

10

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
INDEX NO. 500016/2023
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023

62.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had possession and control of the building located at 8565 Jericho Turnpike, Woodbury, New York.

## STATEMENT OF FACTS

63.    New York State law, 10 NYCRR 415.1s – "Infection control requires that WHITE OAK REHABILITATION AND NURSING CENTER maintain an infection control designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection, in which residents reside and to help prevent the development and transmission of diseases and infections, investigates, controls and takes actions to prevent infections in the facility and determines what procedures such as isolation and universal precautions should be utilized for an individual resident and implements the appropriate procedures.

64.    Federal law, including CFR 483.65, further mandates that WHITE OAK REHABILITATION AND NURSING CENTER maintain a sufficient Infection Prevention and Control Program, and that the facility maintains and utilizes sufficient Personal Protective Equipment (PPE), including gloves, gowns and masks.

65.    In or about January 2020, and likely earlier, Defendants were made aware of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) spreading world-wide and nationally, known colloquially as the coronavirus, that caused severe medical distress and death in individuals who contracted the disease, especially the elderly.

66.    SARS-CoV-2 is known and documented to cause debilitating and deadly disease, the Coronavirus Disease 2019 (COVID-19).

11

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 3
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025
INDEX NO. 500016/2023
RECEIVED NYSCEF: 09/27/2023

67.    COVID-19 can and has spread rapidly in long-term residential care facilities and persons with chronic underlying medical conditions are at greater risk for COVID-19.

68.    As of June 1, 2020, at least 40,600 residents and workers have died from COVID-19 at nursing homes and other long-term care facilities for older adults in the United States. As of January 30, 2021, at least 16,000 residents of long term care facilities died of COVID-19.

69.    On February 6, 2020, the Centers for Medicare & Medicaid Services (CMS) issued written memoranda to WHITE OAK REHABILITATION AND NURSING CENTER advising that coronavirus infection can rapidly appear and spread, and facilities must take steps to prepare for ther, including reviewing their infection control policies and practices to prevent the spread of infection. CMS confirmed that nursing homes had prior notice, including from prior recent public health events such as Ebola virus, 2009 pandemic H1N1 influenza, and Zika outbreaks, of the critical need for nursing homes to be prepared with appropriate personal protective equipment (PPE) use and availability, such as gloves. Gowns. Respirators, and eye protection.[1]

70.    On or about September 22, 2020, through on or about December 12, 2020, Plaintiff's decedent WILLIAM MCDONNELL was admitted to Defendant's facility, and during his admission, was infected with SARS-CoV-2 and COVID-19, and developed respiratory distress and hypoxia, which resulted in his untimely death on December 12, 2020.

71.    Prior to the arrival of coronavirus, WHITE OAK REHABILITATION AND NURSING CENTER had a longstanding history of failing to provide proper infection prevention

---

[1] *Information for Healthcare Facilities Concerning 2019 Novel Coronavirus Illness (2019-nCov)* https://www.cms.gov/files/documents/qso-20-09-all.pdf.

12

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 3

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 500016/2023
RECEIVED NYSCEF: 09/27/2023

and control procedures, and despite being armed with knowledge of prior public health infection events, failed to take steps to prepare to prevent the spread of future infections.

72.    As a direct and foreseeable consequence of such failures, Plaintiff's decedent WILLIAM MCDONNELL has sustained loss, damages, injury and death, and her survivors also suffered loss and damages as a direct consequence of the same.

73.    As set forth below, the claims asserted herein are premised on violations of residents' rights laws pursuant to Public Health Law sec. 2801-d, negligence and gross negligence, and wrongful death. Plaintiff also seeks recovery for punitive damages from the Defendants based upon the aforementioned causes of action, and conduct that was grossly reckless, willful, and wanton.

## AS AND FOR A FIRST CAUSE OF ACTION PURSUANT TO NEW YORK PUBLIC HEALTH LAW 2801-D and 2803C

74.    That at all times hereinafter mentioned, Defendant WILLIAM MCDONNELL is a facility providing therein nursing care to sick, invalid, infirmed, disabled, or convalescent persons in addition to lodging and board or health related services pursuant to New York Public Health Law §2801(2).

75.    At all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a facility providing therein nursing care to sick, invalid, infirmed, disabled, or convalescent persons in addition to lodging and board or health related services pursuant to New York Public Health Law §2801(2).

76.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a facility providing therein nursing care

13

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025
NYSCEF DOC. NO. 1                                 RECEIVED NYSCEF: 01/31/2025
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM    INDEX NO. 50001E/2023
NYSCEF DOC. NO. 1                                 RECEIVED NYSCEF: 09/27/2023

without any negligence on the part of the Plaintiff decedent WILLIAM MCDONNELL, which caused his death.

77.     That at all times hereinafter mentioned, Defendant is a residential health care facility as defined in New York Public Health Law §2801(3).

78.     That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2801(3).

79.     That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2801(3).

80.     That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2801-d.

81.     That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2801-d.

82.     That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2801-d.

83.     That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2801-d.

14

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 600189/2025
NYSCEF DOC. NO. 1    FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM    RECEIVED NYSCEF: 09/27/2025
NYSCEF DOC. NO. 1

84. At all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2803-c.

85. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER is a residential health care facility as defined in New York Public Health Law §2803-c.

86. That all times hereinafter mentioned and material hereto, Defendant WHITE OAK REHABILITATION AND NURSING CENTER nursing homes was a facility subject to the rules and regulations set forth in 42 U.S.C. §1395(i) et seq., and 42 C.F.R. Part 483. Public Health Law Article 28 and New York Code Rules and Regulations, Title 10, Part 415.

87. That all times hereinafter mentioned and material hereto, Defendant, WHITE OAK REHABILITATION AND NURSING CENTER nursing home was a facility subject to the rules and regulations set forth in 42 U.S.C. §1395(i) et seq., and 42 C.F.R. Part 483. Public Health Law Article 28 and New York Code Rules and Regulations, Title 10, Part 415.

88. That all times hereinafter mentioned and material hereto, Defendant, WHITE OAK REHABILITATION AND NURSING CENTER's nursing home was a facility subject to the rules and regulations set forth in 42 U.S.C. §1395(i) et seq., and 42 C.F.R. Part 483. Public Health Law Article 28 and New York Code Rules and Regulations, Title 10, Part 415.

89. That on or about January 8, 2020, through on or about December 12, 2020, Plaintiff's decedent WILLIAM MCDONNELL was admitted to and was a resident at Defendant WHITE OAK REHABILITATION AND NURSING CENTER facility, and during her admission, was infected with SARS-CoV-2 and COVID-19.

15

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
INDEX NO. 602409/2025
NYSCEF FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
INDEX NO. 500016/2023
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023
NYSCEF DOC. NO. 1

90.    That on or about January 8, 2020, through on or about December 12, 2020, Plaintiff's decedent WILLIAM MCDONNELL was admitted to and was a resident at Defendant WHITE OAK REHABILITATION AND NURSING CENTER's facility, and during his admission, was infected with SARS-CoV-2 and COVID-19.

91.    That during the course of her admission, Plaintiff's decedent WILLIAM MCDONNELL was caused to sustain injury due to the negligent acts or omissions of Defendant WHITE OAK REHABILITATION AND NURSING CENTER, resulting in severe and permanent personal injuries, and untimely death.

92.    That during the course of her admission, Plaintiff's decedent WILLIAM MCDONNELL was caused to sustain injury due to the negligence acts and omissions of Defendant WHITE OAK REHABILITATION AND NURSING CENTER, resulting in severe and permanent personal injuries, and ultimately death.

93.    That during the course of her admission, Plaintiff's decedent WILLIAM MCDONNELL was caused to sustain injury due to the negligence acts and omissions of Defendant WHITE OAK REHABILITATION AND NURSING CENTER, resulting in severe and permanent personal injuries, and ultimately death.

94.    That at all times mentioned herein, during his residency, Plaintiff's decedent WILLIAM MCDONNELL was under the exclusive care, custody, control and management of Defendant WHITE OAK REHABILITATION AND NURSING CENTER.

95.    That at all times mentioned herein, during her residency, Plaintiff's decedent WHITE OAK REHABILITATION AND NURSING CENTER was under the exclusive care, custody, control and management of Defendant WHITE OAK REHABILITATION AND NURSING CENTER

16

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 3
INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1
INDEX NO. 602409/2025
RECEIVED NYSCEF: 09/27/2023

96.     That at all times hereinafter mentioned, during Plaintiff's decedent WILLIAM MCDONNELL's stay at Defendant WHITE OAK REHABILITATION AND NURSING CENTER nursing homes she was infected with SARS-CoV-2 and contracted COVID-19, and suffered respiratory distress, hypoxia, and other injuries, caused by the negligence of Defendant WHITE OAK REHABILITATION AND NURSING CENTER and violation of Defendant WHITE OAK REHABILITATION AND NURSING CENTER contract with Plaintiff's decedent WILLIAM MCDONNELL, laws, rules, statutes and ordinances without any negligence on the part of the Plaintiff's decedent WILLIAM MCDONNELL, which caused his death.

97.     That at all times hereinafter mentioned, during Plaintiff's decedent WILLIAM MCDONNELL's stay at Defendant WHITE OAK REHABILITATION AND NURSING CENTER nursing homes she was infected with SARS-CoV-2 and contracted COVID-19, and suffered respiratory distress, hypoxia, and other injuries, caused by the negligence of Defendant WHITE OAK REHABILITATION AND NURSING CENTER and violation of Defendant WHITE OAK REHABILITATION AND NURSING CENTER contract with Plaintiff's decedent WILLIAM MCDONNELL, laws, rules, statutes and ordinances without any negligence on the part of the Plaintiff's decedent WILLIAM MCDONNELL, which caused his death.

98.     That at all times hereinafter mentioned, during Plaintiff's decedent WILLIAM MCDONNELL's stay at Defendant WHITE OAK REHABILITATION AND NURSING CENTER nursing home, he was infected with SARS-CoV-2 and contracted COVID-10, and suffered respiratory distress, hypoxia, and other injuries, caused by the negligence of Defendant WHITE OAK REHABILITATION AND NURSING CENTER  and violation of Defendant WHITE OAK REHABILITATION AND NURSING CENTER contract with Plaintiff's decedent

17

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 2

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

RECEIVED NYSCEF: 09/27/2023

WILLIAM MCDONNELL, laws, rules, statutes and ordinances without any negligence on the part of the Plaintiff's decedent WILLIAM MCDONNELL, which caused his death.

99.     That on December 12, 2020, Plaintiff's decedent WILLIAM MCDONNELL died.

100.    That "death" is an enumerated injury pursuant to New York Public Health Law sec. 2801-d.

101.    That at all times hereinafter mentioned, Plaintiff's decedent WILLIAM MCDONNELL's injuries were substantially contributed to by the negligent acts and/or omissions, willful and intentional criminal misconduct, gross negligence, reckless misconduct and intentional infliction of harm of the Defendants as well as the violation of the resident's rights pursuant to New York Public Health Law §2801-d and enumerated in New York Public Health Law §2803-c.

102.    That at all times hereinafter mentioned, Defendants had a statutorily mandated responsibility to provide Plaintiff's decedent WILLIAM MCDONNELL with the rights granted to nursing home residents by New York Public Health Law §2801-d and enumerated in Public Health Law §2803-c.

103.    That at all times hereinafter mentioned, Defendants' responsibilities and obligations to Plaintiff's decedent WILLIAM MCDONNELL, as outlined in Public Health Law §2803-c, are non-delegable and Defendants had direct and/or vicarious liability for violations, deprivations and infringements of such responsibilities and obligations by any person or entity under Defendants' control, direct or indirect, including their employees. agents. consultants and independent contractors, whether in- house or outside entities, individuals, agencies, pools, or caused by Defendant's policies, whether written or unwritten, or common practices.

104.    That at all times hereinafter' mentioned, Defendants, their employees, agents, consultants and independent contractors, deprived Plaintiff's decedent WILLIAM MCDONNELL

18

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 500016/2023
RECEIVED NYSCEF: 09/27/2023

of the rights granted to her pursuant to Public Health Law §2801-d and as enumerated in Public Health Law §2803-c.

105.    That at all times hereinafter mentioned, the acts and omissions committed by employees and agents of the Defendants were pervasive events which occurred since at least 2019 when Defendants were cited for improper infection control violations, and continued throughout Plaintiff's decedent WILLIAM MCDONNELL's residency, and were such that supervisors, administrators and managing agents of Defendants should have been aware of them.

106.    That at all times hereinafter mentioned, and at all times before the COVID-19 pandemic, despite medical best practices, existing regulations, and specific COVID-19 guidance from CDC, CMS, and DOH, Defendants failed to plan and take proper infection control measures.

107.    That at all times hereinafter mentioned, and at all times before the COVID-19 pandemic, Defendant failed to maintain an infection control program with policies designed to provide a safe, sanitary, and comfortable environment in which residents vulnerable to infection reside and where their health care providers work.

108.    That at all times hereinafter mentioned, and at all times before the COVID-19 pandemic, Defendant failed to have an infection control program which investigated, controlled and took action to prevent infections in the facility and to determine what procedures, such as isolation, should be utilized for an individual resident to prevent continued transmission of disease.

109.    That at all times hereinafter mentioned, and at all times before the COVID-19 pandemic, Defendant failed to isolate residents and properly sterilize and store all equipment to prevent the spread of infection.

110.    That at all times hereinafter mentioned, the Defendant acted willfully, intentionally, recklessly and with gross negligence by knowingly by implementing policies, including accepting

19

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023

COVID-19 positive patients and residents, failing to test patients, residents and staff, etc. with the knowledge that the policies implemented would increase the risk of contracting disease, causing sickness and death in patients and residents.

111. That at all times hereinafter mentioned, the Defendant, it's servants, agents, and/or employees, failed to safely and properly move, monitor, supervise, assist, and/or treat Plaintiff decedent.

112. As a result of the negligence of the Defendant, Plaintiff decedent was caused to sustain severe personal injuries to her head, face and body, obliging her to incur expenses for medical care and resulted in pain, suffering and loss of enjoyment of life.

113. The aforementioned injuries suffered were caused by the sole negligence of the Defendant and without any negligence on the part of the Plaintiff decedent contributing thereto.

114. That at all times hereinafter mentioned, in addition to the damages suffered by Plaintiff's decedent WILLIAM MCDONNELL as the result of Defendants' deprivation of his rights as a nursing home resident, Plaintiff WILLIAM MCDONNELL, the son and Administrator of the Estate of WILLIAM MCDONNELL, is entitled to recovery of compensatory damages pursuant to Public Health Law §2801-d, attorney's fees pursuant to Public Health Law §2801-d(6), punitive damages pursuant to Public Health Law §2801-d(2) and costs.

115. That at all times hereinafter mentioned as a result of the foregoing acts and/or omissions, Plaintiff's decedent WILLIAM MCDONNELL was denied his rights under Public Health Law 32801-d, and as enumerated in Public Health Law §2803-c, and such denial caused injury.

20

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 606106/2025
NYSCEF DOC. NO.
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM    RECEIVED NYSCEF: 09/27/2023
NYSCEF DOC. NO. 1

116. That by reason of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL was forced to undergo medical treatment, incurred medical expense, suffered disfigurement, disability, pain and suffering, mental anguish, loss of enjoyment of life, loss of dignity and death.

117. That at all times hereinafter mentioned, as a result of the foregoing, Plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower Courts, as well as punitive damages pursuant to Public Health Law §2801-d(2), attorney's fees pursuant to Public Health Law §2801-d(6) and costs.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS

118. That at all times hereinafter mentioned, Plaintiff repeats, reiterates and realleges each and every allegation above with the same force and effect as if more fully set forth at length herewith.

119. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to patients, including Plaintiff's decedent WILLIAM MCDONNELL, to protect its patient's rights.

120. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to patients, including Plaintiff's decedent WILLIAM MCDONNELL, to protect its patient's rights.

121. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to patients, including Plaintiff's decedent WILLIAM MCDONNELL, to protect its patient's rights.

122. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to Plaintiff's decedent WILLIAM

21

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM   INDEX NO. 603409/2025

NYSCEF DOC. NO.

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM   RECEIVED NYSCEF: 09/27/2023

NYSCEF DOC. NO. 1

MCDONNELL to hire train, retain, and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to Plaintiff's decedent on a reasonably safe and beneficial manner.

123. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to Plaintiff's decedent WILLIAM MCDONNELL to hire train, retain, and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to Plaintiff's decedent on a reasonably safe and beneficial manner.

124. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to Plaintiff's decedent WILLIAM MCDONNELL to hire train, retain, and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to Plaintiff's decedent on a reasonably safe and beneficial manner.

125. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had notice of Plaintiff's decedent WILLIAM MCDONNELL's need of appropriate intervention to prevent injury and did not implement appropriate intervention.

126. That at all times hereinafter mentioned, due to the negligence of Defendants, Plaintiff's decedent WILLIAM MCDONNELL was infected with SARS-CoV-2 and contracted COVID-19, suffered respiratory distress, hypoxia, and other injuries, at Defendants' facility, which resulted in his death.

22

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM    INDEX NO. 606016/2023
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 09/27/2023

127. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had a duty to protect the patient from injury and to provide reasonable care under the circumstance.

128. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had a duty to protect the patient from injury and to provide reasonable care under the circumstance.

129. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had a duty to protect the patient from injury and to provide reasonable care under the circumstance.

130. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER negligently breached its duties owed to the Plaintiff's decedent WILLIAM MCDONNELL by statute and common-law.

131. That at all times hereinafter mentioned, as a result of the foregoing acts and/or omissions, Plaintiffs decedent WILLIAM MCDONNELL was subject to the negligence of Defendants, causing Plaintiff's decedent WILLIAM MCDONNELL to be forced to undergo medical treatment, incur medical expenses, suffer disfigurement, disability, pain and suffering, mental anguish, loss of enjoyment of life, loss of dignity and death.

132. That at all times hereinafter mentioned, as a result of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL was damaged in a sum which exceeds the jurisdictional limits of all lower Courts.

## AS AND FOR A THIRD CAUSE OF ACTION FOR NEGLIGENCE AGAINST DEFENDANTS

23

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025
NYSCEF DOC. NO. 1    INDEX NO. 500016/2023
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM    RECEIVED NYSCEF: 01/31/2025
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 09/27/2023

133. That at all times hereinafter mentioned, Plaintiff repeats, reiterates and realleges each and every allegation contained in the paragraphs of the Complaint herein, as though more fully set forth herein at length.

134. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to residents, including Plaintiff's decedent WILLIAM MCDONNELL, to protect her nursing home resident's rights pursuant to Public Health Law §2801-d and as enumerated in Public Health Law §2803-c.

135. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to residents, including Plaintiff's decedent WILLIAM MCDONNELL, to protect her nursing home resident's rights pursuant to Public Health Law §2801-d and as enumerated in Public Health Law §2803-c.

136. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to Plaintiff's decedent WILLIAM MCDONNELL to hire, retain, train, and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to Plaintiff's decedent in a reasonably safe and beneficial manner.

137. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER owed a duty to Plaintiff's decedent WILLIAM MCDONNELL to hire, retain, train, and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to Plaintiff's decedent in a reasonably safe and beneficial manner.

138. That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had a statutory obligation to protect the nursing

24

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2
INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1
INDEX NO. 609936/2023
RECEIVED NYSCEF: 09/27/2023

home resident's rights of Plaintiff's decedent WILLIAM MCDONNELL as set forth in Public Health Law §2803-c and to provide reasonable care under the circumstances.

139.    That at all times hereinafter mentioned, Defendant WHITE OAK REHABILITATION AND NURSING CENTER had a statutory obligation to protect the nursing home resident's rights of Plaintiff's decedent WILLIAM MCDONNELL as set forth in Public Health Law §2803-c and to provide reasonable care under the circumstances.

140.    That at all times hereinafter mentioned, as a result of the foregoing acts and/or omissions, Plaintiff's decedent WILLIAM MCDONNELL was subject to the negligence of Defendants, causing Plaintiff's decedent to be forced to undergo medical treatment, incur medical expenses, suffer permanent disfigurement, disability, pain and suffering, mental anguish, loss of enjoyment of life, loss of dignity, and death.

141.    That at all times hereinafter mentioned, as a result of the foregoing, Plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower Courts.

142.    That at all times hereinafter mentioned, Plaintiff repeats, reiterates and realleges each and every allegation contained in the paragraphs of the Complaint herein, as though more fully set forth herein at length.

143.    That at all times hereinafter mentioned, the Defendant WHITE OAK REHABILITATION AND NURSING CENTER acted in so careless a manner as to show complete disregard for the rights and safety of others.

144.    That at all times hereinafter mentioned, the Defendant WHITE OAK REHABILITATION AND NURSING CENTER acted or failed to act knowing that their conduct would probably result in injury or damage.

25

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM    INDEX NO. 602409/2025
NYSCEF DOC. NO. 17                                RECEIVED NYSCEF: 01/31/2025
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM    INDEX NO. 606016/2023
NYSCEF DOC. NO. 1                                 RECEIVED NYSCEF: 09/27/2023

145.   That at all times hereinafter mentioned, the Defendant WHITE OAK REHABILITATION AND NURSING CENTER acted or failed to act knowing that their conduct would probably result in injury or damage.

146.   That at all times hereinafter mentioned, the Defendant WHITE OAK REHABILITATION AND NURSING CENTER acted in so reckless a manner or failed to act in circumstances where an act was clearly required, so as to indicate disregard of the consequences of their actions or inactions.

147.   That at all times hereinafter mentioned, the Defendant WHITE OAK REHABILITATION AND NURSING CENTER conduct, as outlined above, was willful.

148.   That at all times hereinafter mentioned, the Defendant WHITE OAK REHABILITATION AND NURSING CENTER conduct, as outlined above, was in reckless disregard.

149.   That at all times hereinafter mentioned, as a result of the foregoing, Plaintiff is entitled to punitive damages, attorney's fees, and costs.

150.   That at all times hereinafter mentioned, solely as a result of the foregoing, the Plaintiff has been damaged in a sum which exceeds the jurisdictional limits of all lower Courts, plus punitive damages, attorney's fees and costs.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR WRONGFUL DEATH AGAINST DEFENDANTS

151.   That at all times hereinafter mentioned, Plaintiff repeats, reiterates and realleges each and every allegation contained in the paragraphs of the Complaint herein, as though more fully set forth herein at length.

26

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 1

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: 500751/2021
INDEX NO. 500751/2021
RECEIVED NYSCEF: 09/27/2023

152. That by reason of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL sustained severe bodily injury resulting in wrongful death.

153. That as a result of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL left surviving next of kin and distributes.

154. That as a result of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL's estate became liable for and expended money for funeral and other expenses.

155. That as a result of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL's estate suffered pecuniary damages.

156. That as a result of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL's estate sustained all other damages allowed by law.

157. That as a result of the foregoing, Plaintiff's decedent WILLIAM MCDONNELL's Next of Kin have been damaged in a sum which exceeds the jurisdictional limits of all lower Courts.

THEREFORE, Plaintiff demands judgment against the Defendants herein on the FIRST Cause of Action in a sum which exceeds the jurisdictional limits of all lower Courts as well as punitive damages pursuant to PHL §2801-d(2), attorney's fees pursuant to PHL §2801-d(6), and costs; on the SECOND Cause of Action in a sum which exceeds the jurisdictional limits of all lower Courts; on the THIRD Cause of Action in a sum which exceeds the jurisdictional limits of all lower Courts; on the FOURTH Cause of Action in a sum which exceeds the jurisdictional limits of all lower Courts plus punitive damages, attorney's fees and costs; and on the FIFTH Cause of Action in a sum which exceeds the jurisdictional limits of all lower Court, along with disbursements of the action.

To:

27

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 3

FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

INDEX NO. 500016/2023

RECEIVED NYSCEF: 09/27/2023

WHITE OAK REHABILITATION AND NURSING CENTER
8565 Jericho Turnpike
Woodbury, New York 11797

Dated: New York, New York
        September 27, 2023

JEFFREY A. GUZMAN, ESQ.
*Attorney for Plaintiff*
KRENTSEL GUZMAN HERBERT, LLP
17 Battery Place, Suite 604
New York, New York 10004
*Telephone: 212.227.2900*

28

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 2
FILED: NASSAU COUNTY CLERK 09/27/2023 01:08 PM
NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
INDEX NO. 500016/2023
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023

## *ATTORNEY VERIFICATION*

*JEFFREY A. GUZMAN, an attorney at law, duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury that:*

*He is the attorney for the petitioner(s) in the above entitled action. That he has read the foregoing VERIFIED COMPLAINT and knows the contents thereof, and upon information and belief, deponent believes the matters alleged therein to be true.*

*The reason ther Petition is made by deponent and not by the petitioner(s) is that the petitioner(s) herein reside(s) in a county other than the one in which the petitioner's attorneys maintain their office.*

*The source of deponent's information and the grounds of her belief are communication, papers, reports and investigation contained in the file.*

*DATED:    New York, New York*
*September 27 ,2023*

*JEFFREY A. GUZMAN, ESQ*

29

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF FILED: NONASSAU COUNTY CLERK 09/27/2023 01:08 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025
RECEIVED NYSCEF: INDEX NO. 500016/2023
RECEIVED NYSCEF: 01/31/2025
RECEIVED NYSCEF: 09/27/2023

Index No.:

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

AMELIA MCDONNELL, as Proposed Administratrix of the Estate
of WILLIAM MCDONNELL, Deceased,

Petitioner,

-against-

WHITE OAK REHABILITATION AND NURSING CENTER

Respondents.

# VERIFIED COMPLAINT

**KRENTSEL GUZMAN HERBERT, LLP.**
Attorneys for Plaintiff(s)
Office and Post Office Address, Telephone
17 Battery Place, Suite 604
New York, New York 10004
(212) 227-2900

To
Attorney(s) for

Service of a copy of the within
is hereby admitted.
Dated,

Attorney(s) for

PLEASE TAKE NOTICE:
☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within name court on          20
☐ NOTICE OF SETTLEMENT
that an order                          of which the within is a true copy
will be presented for settlement to the HON.      one of the judges of the
within named Court, at
on               20          at          M.
Dated,
Yours, etc.

**LAW OFFICE OF KRENTSEL GUZMAN HERBERT, LLP.**

30

FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 4

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

# Exhibit "C"

# EXHIBIT "C"

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025



## IRONSHORE.
A Liberty Mutual Company

Maria Murphy
Claims Officer
IronHealth
maria.murphy@ironshore.com

Ironshore
28 Liberty Street, 4th Floor
New York, NY 10005
Office: 646-826-6718
Cell: 347-714-0520

February 13, 2024

Via Email: RTrento@whiteoaksrehab.com

Mr. Rick Trento
Jeffrey H and The Estate of Eleanor White dba White Oaks Rehabilitation and Nursing Center
8565 Jericho Turnpike
Woodbury, NY 11797

|  |  |
|---|---|
| Named Insured: | Jeffrey H and The Estate of Eleanor White |
| Policy Number: | HC7PACIKF1002 |
| Policy Period: | April 22, 2023-April 22, 2024 |
| Claimant: | Estate of William McDonnell |
| Date of Incident: | October 9, 2020 - November 27, 2020 |
| Date Reported to Ironshore: | October 19, 2023 |
| Ironshore File Number: | 7TASPC000548220 |

### DECLINATION OF COVERAGE

Dear Mr. Trento:

I am writing on behalf of Liberty Mutual Insurance Company with regard to the Long Term Care Organizations Professional Liability, General Liability, Employment Benefits Liability and Regulatory Proceeding Defense Coverage Policy issued to Jeffrey H and The Estate of Eleanor White by Ironshore Specialty Insurance Company. This letter acknowledges receipt of claim reported via email from Goldie Steinberg of Fairmont Insurance Brokers on October 19, 2023. Attached to the Loss Notice was a copy of the lawsuit filed in Supreme Court of Nassau County, NY alleging that William McDonnell contracted Covid-19 during his stay at White Oak Rehabilitation and Nursing Center which led to his death on December 12, 2020.

We have evaluated the availability of coverage for this matter and our coverage analysis is set forth in detail below. Please note that Ironshore must respectfully deny coverage at this time. However, as noted below, we welcome your input and submission of any additional information that you may feel impact on Ironshore's coverage analysis.

1



FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 4

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

### I. General Policy Provisions

Ironshore issued a Long Term Care Organizations Professional Liability, General Liability, Employment Benefits Liability and Regulatory Proceeding Defense Coverage Policy Number HC7PACIKF1002 to Jeffrey H and The Estate of Eleanor White for the April 22, 2023 to April 22, 2024 policy period, with limits of $1 million each claim and $3 million aggregate subject to a $50,000 Self Insured Retention. The policy of insurance set forth a Retroactive Date of April 22, 2007.

Pursuant to Endorsement #3 – Schedule of Locations with Applicable Retroactive Dates, White Oaks Rehabilitation and Nursing Center is listed as a scheduled location with a Retroactive Date of April 22, 2007.

The Policy also includes Endorsement #12 – Pandemic/Epidemic/Scheduled Infectious Disease Exclusion.

The Ironshore Primary Policy includes the following coverage language:

### I. INSURING AGREEMENTS

**(A) Claims Made Professional Liability Insurance:**
The Insurer will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**, provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

The Ironshore Policy contains Endorsement #12: Pandemic/Epidemic/Scheduled Infectious Disease Exclusion, which states as follows:

### PANDEMIC/EPIDEMIC/SCHEDULED INFECTIOUS DISEASE EXCLUSION

In consideration of the premium charged, it is expressly understood and agreed that:

1. No coverage will be available under this Policy for any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Widespread Illness**, including, but not limited to, **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

a. failure to prevent the transmission of any **Infectious Disease** that is a **Widespread Illness** by an **Insured**, an independent contractor who is providing services to, for, or on behalf of an **Insured**, a **Resident** or a visitor or anyone else for whom the **Insured** is alleged to be or found to be responsible, including, but not limited to, the failure to comply with or to implement any request, demand, order or applicable guidance of any local, state, or federal

---

[1] Words in bold, other than letter captions, are defined in Policy.

2



FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 4

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

governmental authority or specialized agency created by treaty or charter;

b.  failure to diagnose, monitor or treat, or improper treatment of, any **Infectious Disease** that is a **Widespread Illness**;

c.  any act, error or omission in the furnishing, dispensing, distribution, administration or use of any vaccine or other preventative measure for an **Infectious Disease** that is a **Widespread Illness**;

d.  violation of **Rights of Residents** or other statutory violations in relation to or resulting from any **Widespread Illness**;

e.  rationing or withholding of **Professional Services**, due to a lack, shortage, limited availability, or following government directives; or unavailability of, or an inability to procure or otherwise obtain or retain any medications, personnel, equipment or supplies actually or allegedly occurring in relation to or resulting from any **Widespread Illness**;

f.  failure to report to any local, state, or federal government authority or warn any person of an **Infectious Disease** that is a **Widespread Illness**;

g.  failure to test, monitor, clean, contain, sterilize, neutralize, remediate, dispose, respond to, or assess the effects of an **Infectious Disease** that is a **Widespread Illness**;

h.  use, hiring, retention, or supervision of medical providers actually or allegedly lacking any license, credential, privileges, or registration in violation of the regulations or other laws in force at the time of the alleged act, error or omission, or occurrence in relation to any **Widespread Illness**;

i.  vicarious liability, other derivative liability, or joint and several liability of any **Insured** for or with, any other **Insured**, co-defendant, entity, business, manufacturer, medical care provider, person, or governmental entity that has been granted, enjoys, claims or asserts **Immunity**; or

j.  acts or omissions resulting in the loss of **Immunity**.

2. "**Widespread Illness**" means any **Epidemic, Pandemic, or Scheduled Infectious Disease**.

"**Epidemic**" means a widespread occurrence of an **Infectious Disease** that a **Public Health Authority** has declared to be, or assessed or characterized as, an epidemic in any public statement.

"**Immunity**" means immunity from suit or liability, limitation on liability, or other legal protection against civil or criminal liability afforded to any person or entity pursuant to any statute, regulation, ordinance, executive order, declaration by any federal or state agency, or other applicable law with respect to any **Claim** arising from the provision of **Professional Services** in connection with or in response to any **Widespread Illness**.

3



FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 4

INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

**"Pandemic"** means an **Epidemic** that any **Public Health Authority** has declared to be, or assessed or characterized as, a pandemic in any public statement.

**"Public Health Authority"** means any state, federal or local government within the United States of America, including the Center for Disease Control, or any international body, agency or authority, including the World Health Organization, that is tasked with overseeing the public health or is authorized to declare, assess or characterize circumstances as a **Pandemic, Epidemic** or widespread occurrence of **Infectious Disease.**

**"Infectious Disease"** means an illness or disease caused by the infection, presence and growth of pathogenic biologic agents in an individual human or other animal host, including but not limited to any bacteria, virus, mold, mildew, fungi, parasite or other vector and which biologic agents or its toxins are directly or indirectly transmitted to infected individuals from an infectious person, consuming contaminated foods or beverages, contact with contaminated body fluids, contact with contaminated inanimate objects, inhalation, being bitten by an infected animal, insect or tick, or other means. **Infectious Disease** includes all **Scheduled Infectious Diseases.**

**"Scheduled Infectious Disease"** means:
a. the disease known as Coronavirus disease 19 or COVID-19, or any other condition, disease or sickness caused by the virus responsible for COVID-19 or by any mutation of that virus;

## II. Coverage Analysis

As the claim sets forth the allegation that William Campbell contracted Covid-19 during his stay at White Oaks Rehabilitation and Nursing Center (October 9, 2020 – November 27, 2020) which led to his untimely death, the claim is specifically excluded from the Ironshore Policy. As such, Ironshore must respectfully deny coverage under the Policy at this time.

## III. Conclusion

For the reasons set forth herein, Ironshore must respectfully deny coverage under the Policy at this time. If you receive any additional information that you believe may be related to the coverage determination, please notify Ironshore immediately and submit the matter for further coverage analysis. Nothing in this coverage analysis should preclude Jeffrey H and The Estate of Eleanor White from the submission of additional Claims or materials for Ironshore's consideration of coverage under the Policy.

This correspondence is not intended nor shall it be construed as containing an exhaustive listing of all Policy terms, conditions or exclusions which might preclude or affect coverage under the Ironshore Policy. Ironshore does not waive any of the terms, conditions or exclusions of the Policy and nor should any of the acts or provisions described herein be construed in any way as creating an estoppel against Ironshore with respect to other matters of which it does not have present knowledge. We reserve the right to supplement this correspondence and coverage evaluation should facts and circumstances not currently known to Ironshore warrant same.

4



FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM
NYSCEF DOC. NO. 4
INDEX NO. 602409/2025
RECEIVED NYSCEF: 01/31/2025

Again, we welcome you to provide any additional information to Ironshore that you believe may bear upon the issue of coverage under Ironshore's Policy. If you have any questions regarding this correspondence, please do not hesitate to contact me.

Sincerely,

*Maria Murphy*

Maria Murphy, CPCU
Claims Officer
IronHealth
28 Liberty Street, 4th floor
New York, NY 10005
347-714-0620 (cell)

Cc: Goldie Steinberg / Fairmont Insurance gsteinberg@fairmontins.com

5



FILED: NASSAU COUNTY CLERK 01/31/2025 03:54 PM

NYSCEF DOC. NO. 1

INDEX NO. 602409/2025

RECEIVED NYSCEF: 01/31/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No: 602409/2025

---

JEFFREY H. WHITE, individually, and as Administrator of THE ESTATE OF ELEANOR WHITE and WHITE OAKS REHABILITATION AND NURSING CENTER,

Plaintiffs,

- against-

IRONSHORE SPECIALITY INSURANCE COMPANY

Defendants.

---

# SUMMONS and COMPLAINT

---

McDONNELL ADELS & KLESTZICK, PLLC
Attorneys at Law
Attorneys for PLAINTIFFS
Office and Post Office Address, Telephone
401 Franklin Avenue- Suite 200
Garden City, New York 11530
(516) 328-3500

## CERTIFICATION PURSUANT TO 22 N.Y.C.R.R. §130-1.1a

EVAN W. KLESTZICK, ESQ., hereby certifies that, pursuant to 22 N.Y.C.R.R. §130-1.1a, the foregoing Summons and Complaint is not frivolous nor frivolously presented.

By: /s/ *Evan W. Klestzick*
EVAN W. KLESTZICK, ESQ.

Dated:   Garden City, New York
          January 31, 2025

---

To

          Attorney(s) for Plaintiff

---

Service of a copy of the within ^ is hereby admitted

Dated, ^

...................................................................................
Attorney(s) for ^

---

Please take notice
☐ Notice of entry
that the within is a (*certified*) true copy of a
duly entered in the office of the clerk of the within named court on
☐Notice of Settlement
that an order ^ of which the within is a true copy will be presented for ^ settlement to the HON. ^ one of the judges
of the within named court, at ^
on ^
DATED: JANUARY 2025
^

To ^

Attorney(s) for ^

Yours, etc.
**McDONNELL ADELS & KLESTZICK, PLLC**
Attorneys at Law
*Attorneys for Plaintiffs*
*Office and Post Office Address*
401 FRANKLIN AVENUE- Suite 200
GARDEN CITY, NEW YORK 11530